**ST. JOSEPH PROFESSIONAL BUILDING CORPORATION et al., Appellants,**

**v.**

**AMERICAN NATIONAL INSURANCE COMPANY et al., Appellees.**

**No. 895.**

Court of Civil Appeals of Texas, Houston (14th Dist.).

June 26, 1974.

Rehearing Denied July 17, 1974.

William H. Scott, Jr., Charles Orr, Taylor Moore, Browne & Moore, Houston, for appellants.

Richard B. Miller, Baker & Botts, W. Robert Brown, Liddell, Sapp, Zivley & Brown, Houston, for appellees.

CURTISS BROWN, Justice.

This suit arises out of an alleged breach of contract and civil conspiracy.

A number of plaintiffs brought this action below; three appealed from instructed verdicts for defendants and will be referred to collectively as St. Jo. Defendants below were the American National Insurance Company (ANICO) and the Texas Commerce Bank National Association (the Bank). St. Jo alleged a cause of action for breach of contract against ANICO and a cause of action for civil conspiracy against ANICO and the Bank.

St. Jo began plans in 1962 to build a professional building in Houston, Texas. It obtained a commitment for long-term financing from New York Life Insurance Company for $3,600,000. In 1964, during construction, St. Jo ran into difficulties in meeting the terms of that commitment and sought financing with ANICO. ANICO issued a loan commitment for a total of $3,800,000. The ANICO commitment provided for funding of $3,200,000 when the shell of the building was completed and certain named tenants were obtained and had approved their leased areas. The remaining $600,000 was to be funded in six

$100,000 installments when "guaranteed annual rentals" produced from five-year leases reached certain dollar levels.

Using the ANICO commitment as security, St. Jo entered into a Loan Agreement with the Bank in August 1964 and executed a note and deed of trust covering the building and land to the Bank for $3,800,000. The Bank then entered into a Participation Agreement with ANICO, whereby ANICO agreed to purchase the Bank's interest in the $3,800,000 note and deed of trust as St. Jo complied with the ANICO commitment for funding. The Bank agreed to apply loan payments between the parties ratably based on proportionate ownership of the note.

In October 1964 the building was completed and the named tenants had accepted their completed space. ANICO therefore funded the first $3,200,000. St. Jo applied at that time for the first $100,000 installment. Marc Cuenod, mortgage supervisor for ANICO, indicated by letter to St. Jo and the Bank that funds for the additional draws would not be advanced until tenants comprising "guaranteed annual rental" were in occupancy. St. Jo now claims that this letter added a new requirement and constituted a breach of the contract between ANICO and St. Jo as set out in the ANICO commitment. St. Jo complied with this requirement on all of its funding, and by December 15, 1965, ANICO had funded three $100,000 installments. The commitment expired on that day by its terms, but, on request of St. Jo, ANICO extended it to June 1, 1966. This extension gave St. Jo six extra months to qualify for the three additional $100,000 draws, and it also extended the interest-only provisions of the agreement to that date. Two days later, ANICO funded the fourth increment after determining that a sufficient occupancy level had been attained.

In April 1966, St. Jo wrote to ANICO claiming sufficient occupancy for the fifth increment. Marc Cuenod inspected the building for ANICO to determine compliance. After the inspection Cuenod told H. M. Bennett and John Bennett, representatives of St. Jo, that it appeared that St. Jo had qualified for the fifth increment. He further stated that ANICO would probably have to extend their commitment to December 15, 1966, to allow St. Jo to qualify for the sixth increment. St. Jo made a formal request for an extension by letter to ANICO's Finance Committee on May 23, 1966.

On May 31, 1966, the Finance Committee decided not to extend its commitment beyond June 1, 1966, and so notified the Bank. On June 1, 1966, the Bank made written demand for full payment of its $3,800,000 loan, pursuant to the Loan Agreement, by June 6, 1966. St. Jo offered to pay the Bank $200,000, which was the Bank's remaining interest in the note. Since it was obligated under its Participation Agreement to apply all funds proportionately, such a payment would not have extinguished St. Jo's debt; the Bank therefore refused to accept it. St. Jo appealed again to ANICO for an extension. ANICO responded by offering a Modification Agreement, which was executed by St. Jo on June 10, 1966. This agreement changed the terms of ANICO's commitment by raising the interest rate on the permanent loan. It also agreed to accept full payment by September 10, 1966, at 101 percent of par to allow St. Jo to refinance. In return ANICO agreed to allow payment to the Bank of the $200,000 without a proportionate distribution to ANICO.

To pay off the Bank and prevent foreclosure, St. Jo turned to Allied Concord Finance Corporation (Allied) for a $200,000 loan on a demand note. St. Jo had borrowed $400,000 from Allied in 1965, giving a second mortgage on the building. ANICO took no further action, and in the spring of 1967 Allied foreclosed on its second lien and took control of the building. In 1968 Allied abandoned its position; ANICO foreclosed and purchased the building at the public sale.

St. Jo complains on appeal that it offered sufficient evidence on both its breach of contract and civil conspiracy theories to preclude the granting of an instructed verdict. The standard of review in this case, then, is whether, indulging all reasonable inferences for the appellant, there was any evidence of probative value on which this case should have been submitted to the jury. Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S. W.2d 60 (1953).

St. Jo claims two instances in which ANICO breached its contract. First, as mentioned previously, St. Jo claims that the requirement of tenant occupancy under the six incremental draws was a breach of the agreement in the commitment. The pertinent language of the commitment is contained in paragraph 8 and is as follows:

8. The balance of the loan is to be disbursed prior to December 15, 1965 in not more than 6 additional fundings as follows:

A. $100,000 additional loan will be available when guaranteed annual rentals from satisfactory five-year or longer leases reach $420,000 from basement, first floor, and parking garage plus not more than 53,900 square feet of net rentable office area.

B. For each $20,000 in guaranteed annual rental produced by satisfactory five year leases from not more than 4,000 S.F. of net rentable office area, over and above the $420,000 annual rental referred to in A above, an additional $100,000 loan amount will be available up to and including a maximum total loan of $3,800,000.

The question to be decided is whether the terms "guaranteed annual rental produced by satisfactory five year leases" include the requirement of tenant occupancy.

The commitment clearly requires completion and tenant acceptance for the original $3,200,000 funding. It does not expressly provide for completion, acceptance, or occupancy for the six increments. It does provide for rental *produced*, which could imply an occupancy requirement. This would be a permissible construction, which, in the case of an unambiguous contract, is a matter for the court. Tower Contracting Company v. Flores, 157 Tex. 297, 302 S.W.2d 396 (1957).

If it could be said the commitment was ambiguous, then there are two extrinsic factors which support a construction favoring tenant occupancy. As these factors are undisputed, construction would remain a matter for the court. Turner v. Montgomery, 293 S.W. 815 (Tex.Com. App.1927, jdgmt adopted). First, there is the three-party financing arrangement involved. The Loan Agreement between St. Jo and the Bank provides that as St. Jo obtains leases, the Bank will advance accrued construction costs on a monthly basis. If ANICO were obligated to fund a $100,000 increment on execution of satisfactory leases, rather than after occupancy, then the situation could arise in which ANICO would be obligated to increase its participation with the Bank by $100,000 in a loan which the Bank had not yet made.

Second, letters introduced in evidence indicate that St. Jo acquiesced in ANICO's interpretation of the commitment. St. Jo claims that ANICO altered the agreement after St. Jo asked for funding of the first increment. St. Jo wrote letters on December 10, 1964, February 9, 1965, April 5, 1965, and June 2, 1965, claiming executed leases sufficient to qualify for the second through fifth increments. These letters concluded, "If you would approve these leases and write your usual letter . . . [to the Bank], which will enable us to draw additional construction money, it would be greatly appreciated." Each letter was followed by a letter by Marc Cuenod for ANICO to Richard Adkins who acted as agent for St. Jo and ANICO in dealing with the Bank. These letters stated the nature of the leases submitted, and they all include, "It is understood that no funds will be advanced by us until the spaces

provided in the leases have been satisfactorily completed, the spaces accepted by the tenants, and the tenants installed in the spaces." On April 26, 1965, June 29, 1965, October 25, 1965, and November 26, 1965, St. Jo wrote to ANICO listing tenants who had "moved in and occupied and accepted their space," and requesting that the first, second, third, and fourth increments respectively be funded. This correspondence shows that St. Jo was aware of ANICO's interpretation of the commitment. St. Jo induced action under that interpretation and accepted the benefits of the funding of four $100,000 increments. St. Jo is, therefore, estopped to assert a different interpretation of the contract. Champlin Oil & Refining Company v. Chastain, 403 S.W.2d 376 (Tex.Sup.1965). In the alternative, this correspondence indicates the interpretation placed on the funding provision by the parties and supports the construction that tenant occupancy was required.

St. Jo further alleged that the comments made by Marc Cuenod after his inspection of the building in April 1966 amounted to a promise binding ANICO to fund the fifth increment and extend the commitment to December 15, 1966. Taking Cuenod's statements in a light most favorable to St. Jo, they are only binding if Cuenod had the authority, as agent of ANICO, to alter the contract. This evidence came in through testimony of Marc Cuenod and again through testimony of John Bennett. Both times the court instructed that the testimony was being admitted to show the state of mind and understanding of John Bennett and the existence of the verbal act, but expressly stated that it was not admitted as evidence varying the written agreements between the parties. Furthermore, letters from St. Jo to ANICO dated December 10, 1965, and May 23, 1966, disclose St. Jo's knowledge that ANICO's Finance Committee had the sole power to extend the commitment. An instructed verdict for ANICO, was, therefore, proper on both of St. Jo's theories of breach of contract.

In support of its claim of civil conspiracy, St. Jo points to a number of acts on the part of ANICO and the Bank. In its brief St. Jo has reduced the eighteen conspiratorial acts alleged in its petition to six more general acts, as follows:

1. ANICO's representations in April 1966 through Cuenod that it would fund the fifth increment and extend the commitment,

2. ANICO's refusal to fund the final two increments,

3. the Bank's demand on June 1, 1966, for full payment of the $3,800,000 note,

4. the Bank's refusal to accept $200,000 plus interest without ANICO's approval,

5. ANICO's refusal to grant that approval unless St. Jo agreed to modification of the commitment, and

6. the imposition of the June 10, 1966, modification on St. Jo by ANICO and the Bank, thereby increasing St. Jo's financing burdens and causing the loss of the project.

The Texas Supreme Court has recently reviewed the Texas law of civil conspiracy in Schlumberger Well Sur. Corp. v. Nortex Oil & G. Corp., 435 S.W.2d 854 (Tex.Sup.1968). It there restated, at page 856, the definition of a civil conspiracy as "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." An analysis of St. Jo's allegations and evidence reveals that they fail to meet this basic definition.

Assuming that Cuenod made the representations alleged. as "act number one," ANICO's refusal to comply was neither unlawful nor wrongful, because there is no evidence that Cuenod had the power to alter the contract between the parties. The second, third, and fourth acts alleged were clearly within the rights of ANICO

and the Bank as conferred by their agreements with St. Jo. "Act number five" was within ANICO's rights under the commitment and its Participation Agreement. ANICO gave up the right to demand its proportionate share of any payment to the Bank and payment of principal and interest in return for a higher interest rate on its permanent loan. "Act number six" was similarly lawful and not wrongful. ANICO merely offered St. Jo an alternative to immediate loss of the building on foreclosure by the Bank. St. Jo was even given favorable terms on which to refinance the project if it was in fact as valuable as St. Jo claimed. Any coercion in the situation was caused by St. Jo's inability to meet its contracted obligations.

Appellants completely failed to make a prima facie case in support of either their breach of contract or civil conspiracy theory. The instructed verdict was therefore proper.

Affirmed.