**Frania Tye LEE**

v.

**Ray Lee HUNT, Executor of the Estate of H. L. Hunt.**

Civ. A. No. 76–0628.

United States District Court,
W. D. Louisiana,
Shreveport Division.

Rulings on Evidence Jan. 10, 1978.

On Validity of the Marriage
Jan. 11, 1978.

On Issue of Fraud Jan. 13, 1978.

On Motion to Enforce Settlement
Agreement Dec. 19, 1979.

Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., Larry E. Donohoe, Jr., Onebanke, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., Sidney E. Cook, Cook, Clark, Egan, Yancey & King, Shreveport, La., Thomas A. Rayer, Denechaud & Denechaud, New Orleans, La., for Hugh L. Hunt.

STAGG, District Judge.

## MEMORANDUM RULING

This action comes again before the court, this time on the motion of defendant to enforce the settlement agreement against Hugh S. Hunt (Hugh).[1] Although not formerly a party to this litigation, Hugh, the plaintiff's only living son, has from its inception been deeply involved in the lawsuit, if not the moving force behind it. He has now been joined as a party to the motion and is the only person involved in the settlement negotiations who has not executed the final settlement agreement.

### I.

The allegations of plaintiff's Complaint, more fully discussed elsewhere,[2] can be summarized as follows. Mrs. Lee met "Franklin" Hunt in Tampa, Florida and they were married in that city on November 11, 1925. Shortly thereafter, they moved to Shreveport, Louisiana where two children were born to the marriage. In 1930, the family moved to Dallas, Texas, where a third child was born. In May of 1934, Mrs. Lee learned that "Franklin" Hunt was actually H. L. Hunt and that he had been married to Lyda Bunker Hunt for some years prior to 1925. A short time later Mrs. Lee moved to New York where a fourth child was born.

On January 24, 1942, after Mrs. Lee had threatened suit, Hunt paid her a substantial sum in settlement of her claims against him, though without admitting the validity

Wallace A. Hunter, Roger M. Fritchie, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, La., for plaintiff.

1. Also referred to in the record as "Hue R. Lee," "Hue R. Hunt," and "Hugh Lee Hunt."

2. See *Lee v. Hunt*, 431 F.Supp. 371 (W.D.La. 1977); *Lee v. Hunt*, 415 F.Supp. 245 (M.D.La. 1976). *See also* this Court's Memorandum Rulings of December 14, 1977, January 10, 1978, January 11, 1978, January 12, 1978, and January 13, 1978.

of her claims. It is further alleged that Mr. Hunt promised to acknowledge in his will their purported marriage and the legitimacy of their children, and to bequeath to her and their children properties in settlement of her interest in the community. When Hunt's death revealed that he had not kept his promise, Mrs. Lee filed this action seeking to be recognized as his putative wife and declared owner of one-half of the community property acquired during the relationship. Defendant staunchly denies most of these allegations.

Following protracted pretrial proceedings, the case was tried to a jury beginning on January 9, 1978. On the morning of the sixth day of trial, after plaintiff had rested her case, the parties announced that a compromise had been achieved and an agreement was entered into by the parties and the other members of the Hunt families ("January 16 agreement"). The agreement was dictated by the parties in Chambers and signed in the presence of the Court by all concerned (or by their agents) including Hugh. Hugh was given a copy; he read it in presence of the Court and acknowledged to the court that he understood its terms. It was clearly understood that a more formal document would be executed as soon as it could be prepared. The jury was discharged and a judgment of dismissal was entered accordingly.

Hugh now claims that he did not understand the January 16 agreement to be binding and that, in any event, the more formal document executed by all of the other parties to the earlier agreement does not accurately reflect the dictated agreement. The Court disagrees with Hugh Hunt on both counts and, for reasons set out below he is obligated to execute the Master Settlement Agreement.

3. *See* the Transcript of the December 7, 1978 Hearing, at 9–11.

4. Even assuming the soundness of the recent decision in *Fairfax Countywide Citizens v. Fairfax County*, 571 F.2d 1299 (4th Cir.), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978) (independent basis for jurisdiction required in action to enforce settlement—as opposed to reopening the action under Rule 60(b)—unless settlement agreement is con-

Before considering the merits of these contentions, however, there are several procedural objections raised by Hugh that must be addressed.

## II.

Following his joinder to this action, Hugh moved to vacate the judgment of dismissal entered following the settlement, thus reopening the entire action, and, alternatively, to dismiss the proceedings against him on the basis of several provisions of Fed.R. Civ.P. 12(b). Hugh has withdrawn the motion to vacate the judgment under Rule 60(b).[3] Hugh's motion under Rule 12(b) presents questions of subject matter jurisdiction, venue, personal jurisdiction, service of process, and the sufficiency of the pleadings against him. The questions will be considered in that order.

 The memorandum accompanying Hugh's motion to dismiss offers little enlightenment concerning the basis for his claim that this court lacks jurisdiction over the subject matter of the motion to enforce the settlement agreement. He appears to rely on the fact that he was not a party to the litigation that was settled. While this may be offered as a defense on the merits to the action to enforce the settlement, it has nothing to do with the subject matter jurisdiction of this Court. It is clear beyond cavil that a court may entertain an action to enforce a settlement of litigation pending before it.[4] *Pearson v. Ecological Science Corp.*, 522 F.2d 171 (5th Cir. 1975), *cert. denied sub nom. Skydell v. Ecological Science Corp.*, 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976); *Massachusetts Casualty Insurance Co. v. Forman*, 469 F.2d 259 (5th

tained, or to be contained, in judgment), *but see Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368 (6th Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976) (lack of diversity does not deprive court of power to enforce settlement agreement not contained in judgment), this Court has jurisdiction because Hugh is a citizen of Maryland, plaintiff is a citizen of Georgia, and defendant is a citizen of Texas.

Cir. 1972); *Cia Anon Venezolana de Navegacion v. Harris*, 374 F.2d 33 (5th Cir. 1967).

■ Hugh objects to venue on the ground that venue was held proper in the main action only because defendant waived its objection, an act which cannot be imputed to Hugh. *See Lee v. Hunt*, 431 F.Supp. 371, 379 (W.D.La.1977). This argument fails on two counts. First, judicial economy and the policy favoring settlement as an *end* to litigation require that settlement agreements be enforced in the same court in which the litigation was pending. *Aro Corporation v. Allied Witan Co.*, 531 F.2d 1368, 1371 (6th Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976); *D. H. Overmyer Co. v. Loflin*, 440 F.2d 1213 (5th Cir.), *cert. denied*, 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971). Second, an action to enforce a settlement agreement is analogous to an action for breach of contract. *Kaspar Wire Work, Inc. v. Leco Engineering and Machine, Inc.*, 575 F.2d 530, 538 (5th Cir. 1978); *Florida Education Association, Inc. v. Atkinson*, 481 F.2d 662, 663 (5th Cir. 1973). The subject and merit of the original litigation are no longer material, the cause of action for enforcement arises out of Hugh's signing and repudiation of the agreement in this district. Thus, not only is venue proper in this district, this may be the only court in which the matter might have been brought.[5]

■ The memorandum in support of the motion to dismiss is also silent regarding the related questions of personal jurisdiction and insufficiency of service of process. The motion itself simply states that Hugh has not transacted any business or had other contacts with this state sufficient to support invocation of the long-arm statute. This is clearly not so. The negotiation and execution of a settlement agreement constitutes transaction of business and, when that agreement is the subject of a lawsuit, justifies resort to the long-arm statute. *Meetings & Expositions, Inc. v. Tandy Corporation*, 490 F.2d 714, 717 (2d Cir. 1974). Further, joinder of non-parties involved in the settlement process is a permissible alternative to an independent action. *Wood v. Virginia Hauling Co.*, 528 F.2d 423 (4th Cir. 1975); *Meetings & Expositions, Inc. v. Tandy Corporation, supra*.

Accordingly, the motion to dismiss must be denied. The challenge to the sufficiency of the pleadings under Rule 12(b)(6) will be referred to the merits, to which we must now turn.

### III.

The settlement in this case is a creature of the unusual family setting in which it was born. The agreement appears at once generous and exacting, reflecting, perhaps, the powerful incentives for compromise on both sides of the table. Contrary to the normal inference offered by a settlement at this stage of the proceedings, Mrs. Lee was not negotiating from a legal position of strength. A series of evidentiary rulings issued during the trial had greatly restricted the scope of her claim and proof.

On the second day of trial, the Court ruled that Mrs. Lee could not introduce parol evidence to prove that the 1942 settlement with H. L. Hunt was not intended to encompass her claim of community property.[6] The following day the Court ruled that the civil effects of the alleged putative marriage ended in 1934 when Mrs. Lee admittedly discovered the pre-existing impediment to her marriage, namely, H. L. Hunt's marriage to Lyda Bunker Hunt. Thus, the 1942 settlement was not voided by the contractual incapacity between husband and wife. By the same token, her claim of community property was restricted to the

---

5. The Court cannot agree with defendant that filing a motion to vacate the judgment simultaneously with an objection to venue constitutes a waiver of the latter. The spirit of the Federal Rules is to encourage unitary rather than fragmentary proceedings, even if this means placing inconsistent claims and defenses at once before the court. 15 Wright, Miller & Cooper, Federal Practice and Procedure § 3829 at 198.

6. *See* the "Rulings on Evidence" filed on January 10, 1978. (Copy attached.)

period from 1925 to 1934.[7] Finally, on the fourth day of trial, the Court ruled that the jury would not be allowed to consider the claim that H. L. Hunt promised to acknowledge their marriage in his will and to treat her children equally with the children of his first marriage, because she was unable to produce the corroborating witness required by the Louisiana Dead Man's Statute.[8]

Mrs. Lee's remaining response to the Estate's defense of compromise and transaction was to attempt to void the 1942 agreement on grounds of fraudulent inducement—that H. L. Hunt misrepresented, or failed to disclose, the value of the community property.[9] Beyond the difficulty of proof, this tactic faced a serious objection of prescription due to the passage of nearly thirty-four years between execution of the agreement and the filing of this suit. While none of the rulings impaired Mrs. Lee's chances of establishing the putative marriage,[10] she was aware of the substantial and potentially damaging evidence to be presented by the defendant on that issue.

Mrs. Lee thus approached the Monday morning settlement weighing the sacrifice of her opportunity for official recognition of her marriage against the benefit to herself and her family from a multi-million dollar settlement. There was also the consideration that a substantial settlement would tend to confirm her claim in the public mind, thereby achieving some degree of recognition for her marriage. The Estate, on the other hand, was weighing these costs against its interest in withdrawing the dispute from the public arena, avoiding the chance of a partial verdict against it, and obtaining and end to all *future* related litigation.[11] Hugh's stance in the negotiations was one of embattled concession; he neither accomplished his goal of legitimation nor shared directly in the spoils, nor was he even free to fight again another day. As his counsel, perhaps unwittingly,[12] stated in the briefs: "as an accommodation to the plaintiff, his mother, Mr. Hunt voluntarily agreed to execute a settlement which would terminate this litigation in order to enable his mother to derive whatever benefits she could from this proposed settlement.[13]"

Ordinarily, this Court would summarily enforce a settlement agreement such as that dictated in Chambers on January 16. In this case, however, Hugh has raised factual questions concerning the existence of an agreement and what that agreement covers. In accordance with the teaching of *Pearson v. Ecological Science Corp.,* 522 F.2d 171, 176 n. 5 (5th Cir. 1975), and *Massachusetts Casualty Insurance Co. v. Forman,* 469 F.2d 259 (5th Cir. 1972), a plenary hearing was held on December 7, 1978 and all parties were given the opportunity to

7. *See* the Memorandum Ruling filed on January 11, 1978. (Copy attached.)

8. *See* the Memorandum Ruling filed on January 13, 1978 (together with the first part of the Ruling of January 10). The Ruling was issued before the testimony of Wright Matthews, and alludes to the possibility that he might become the necessary corroborating witness. He did not. (Copy attached.)

9. *See* the Memorandum Ruling filed on January 10, 1978, at 4–5.

10. "If the settlement was valid, it released any claim to property of H. L. Hunt by virtue of the relationship between him and Frania Tye. It does not defeat her right to be declared the putative wife of H. L. Hunt if she can establish the elements of that claim, but it bars her recovery of any property by virtue of a declaration that she was his putative wife." Memorandum Ruling of January 10, 1978, at 4.

11. "In the main demand, Mrs. Lee alleged she was the putative spouse of H. L. Hunt. Had she been successful in such assertion, the offspring of the relationship might be entitled to claim various sorts of inheritance rights as legitimate heirs or half-brothers or sisters of members of [the other families]." Defendant's Post Hearing Brief in Support of Petition to Enforce Settlement Agreement, filed on February 7, 1979, at 21.

12. *See* the "Reply Memorandum of Hugh L. Hunt in Reply to Post Hearing Brief in Support of Petition to Enforce Settlement Agreement", filed on February 13, 1979, at 1.

13. Memorandum in Support of Motion to Vacate or Modify Judgment and Motion to Dismiss, filed on November 22, 1978, at 2–3.

present such evidence as they deemed material. The following analysis of Hugh's objections is based on that hearing, the record, and the Court's own longstanding involvement with this lawsuit.

## IV.

When presented with a settlement and asked to enforce it, a court must first determine if a binding agreement was actually reached and, if so, what that contract provides. *Wood v. Virginia Hauling Co.,* 528 F.2d 423, 425 (4th Cir. 1975). Settlement agreements being contracts, their enforceability is governed by the whole law of the forum state. *Florida Education Association, Inc. v. Atkinson,* 481 F.2d 662, 663 (5th Cir. 1973). However, the parties are free to choose any law to govern the contract's interpretation, which must be distinguished from its validity or enforceability.

Several of the objections raised by Hugh at the hearing are directed to the validity of the January 16 agreement. First, Hugh asserts that he did not participate in any settlement negotiations prior to the January 16 conference and that he was not represented by counsel at that conference. Neither circumstance is of any consequence nor is either assertion entirely correct. Hugh's letter to this Court details his involvement in the settlement negotiations during the trial.[14] He had also been involved in retaining counsel for Mrs. Lee and had consulted with them throughout the trial.[15]

The transcript of the January 16 conference shows that Hugh was painfully aware of the effect of the agreement, he simply didn't want to permit it. Nonetheless, he stated "I will sign whatever papers you want"—and did. The pressure to which he was subjected is not the sort of duress that will relieve one of his knowing obligations. La.Civ.Code arts. 1819, 1851. *See United States v. Lamont,* 155 U.S. 303, 310, 15 S.Ct. 97, 39 L.Ed. 160 (1894). If Hugh is to void the January 16 agreement, he must establish some intrinsic defect. To this end, he asserts that it fails to state the dollar amount of the settlement and that it was not intended to become binding until signed by his wife and major children. The first objection is overcome by La.Civ.Code art. 1894: "An agreement is not the less valid, though the cause be not expressed." The second objection is not so easily met.

At the outset of the settlement conference, the Court stated that the transcript would have a place for the participants "to sign their names indicating their full agreement with the terms."[16] This sobering theme was repeated throughout the agreement, as when the Court reminded Hugh, just before he left the room, "that this was a final settlement."[17] There is no reasonable basis for believing that the January 16 agreement was not intended to bind the signatories. It is true that the agreement contemplated that the spouses and major children of Mrs. Lee's children, or their representatives, would be required to sign the more formal document.[18] However, it is equally true that this requirement was inserted solely for the benefit of the Estate and other Hunt families, and could thus be waived by them.[19] *Probst v. DiGiovanni,*

---

**14.** *See* Hugh Hunt Exhibit 1, at 2–3, filed in the record of the December 7, 1978 Hearing (*e. g.,* "our intention at all times in this suit was to go for the putative wife issue without compromise with the cash part being negotiable.")

**15.** *Id.* at 4. ("I even asked our attorneys to hint to the other Hunt families to allow the putative if they did not have to pay any money, but our attorneys did not want to consider even mentioning that idea to them."). Hugh signed the contract retaining plaintiff's counsel and agreed to retain them if the evidence revealed any cause of action on his behalf.

**16.** Trial transcript at 1256.

**17.** *Id.* at 1267.

**18.** "It is understood that this release will be signed by Mrs. Lee and by her children and grandchildren. . . . Or their representatives." Trial transcript at 1273 (counsel for the Estate).

**19.** "In our discussion, I indicated that it was represented to me that the major children of these people need not sign, had no legal rights. If we discover they do have legal rights, we are going to require them to sign."

232 La. 811, 95 So.2d 321, 324 (1957); *Cuna v. Elton Lumber Co., Ltd.* 148 La. 1097, 88 So. 493 (1921); *Lotz v. Hessler,* 369 So.2d 265 (La.App. 4th Cir.), *writ denied,* 371 So.2d 1343 (La.1979). The more formal document does not require the signatures of his spouse and children because the Estate determined to its satisfaction that these persons have rights derivative only from Hugh, and his signature alone suffices.[20]

Hugh contends that the requirement that his own family sign the more formal document was the cause of his agreement to be bound. But this is not a case of reciprocal agreements; Hugh would derive no benefit from the agreement of his family, nor would they benefit from his agreement. Rather, it was from their refusal to sign that he hoped to benefit, to be released from his agreement. This argument can only be understood from the point of view of a promisor in bad faith. No good faith party to a contract can have as his motive the defeat of the agreement. However, the record is replete with instances of such an attitude on the part of Hugh. Shortly after the settlement conference, Hugh condemned the agreement, stating "if I could get out of it I would get out of it." [21] This Court will not assist Hugh in that effort. *See* La.Civ.Code art. 1901. The January 16 agreement was voluntarily executed with knowledge of its binding effect, and any mistake of law or fact on Hugh's part cannot void it. La.Civ.Code arts. 1825, 1846(2). The question thus becomes whether the document that Hugh has refused to sign is an accurate reflection of the January 16 agreement.

## V.

The January 16 agreement clearly contemplated that a more formal document would be drafted embodying the releases described in the agreement. Preparation of this document, the "Master Settlement Agreement", was commenced immediately after the conference by all counsel involved in that agreement. Contrary to the statement of Hugh's counsel in the briefs, it did not take eight months of hard negotiating to confect that document. By the time of the February 25 conference, the document was largely complete. At that point, however, Hugh stated that he needed time to consult his counsel. While the parties awaited his response, Mrs. Lee discharged her counsel and was delayed in enrolling new counsel. Finally, Hugh refused to sign and the Deposit Agreement and other papers relating to this motion had to be prepared.

It should be noted that all of the eighteen necessary signatories other than Hugh, many of whom have interests similar to his, have signed the agreement, reflecting their belief that it accurately represents their earlier agreement. The Estate contends that the result should be the same even if the Master Settlement Agreement were materially different, because Hugh cannot be heard to complain of the non-performance of a condition of the earlier agreement, (*i. e.,* that a representative more formal document be drafted) when he caused that non-performance by refusing to negotiate in good faith. The Court need not rely on that defense because it finds that all of the provisions of the Master Settlement Agreement are within the contemplation of the January 16 agreement.[22]

Hugh maintains that the Master Settlement Agreement departs from the January 16 agreement in its treatment of five subjects: confidentiality, the Reliance Trusts,

---

"[I]f we determine that they (spouses) have legal . . . rights, we are not going to be signing that release if they don't." Trial transcript at 1265 and 1274. (Counsel for children of Lyda Bunker Hunt).

**20.** Post Hearing Brief in Support of Petition to Enforce Settlement Agreement, filed on February 7, 1979, at 20.

**21.** Transcript of December 7, 1978 Hearing, at 94.

**22.** "The obligation of contracts extends not only to what is expressly stipulated, but also to everything that by law, equity or custom, is considered as incidental to the particular contract, or necessary to carry it into effect." La. Civ.Code art. 1903.

distribution of the settlement proceeds, the scope of the releases, and the choice of law to govern interpretation of the agreement. The arguments will be considered in that order.

■ The January 16 agreement permanently prohibits public communication by any party to the agreement concerning the lawsuit or the relationship between Mrs. Lee and H. L. Hunt and between their respective families. It also provides that the more formal document shall contain "appropriate indemnity provisions." Hugh complains that the Master Settlement Agreement is too restrictive and objects to its provision for liquidated damages. While certainly more specific, the master agreement is no more restrictive than the broad language of the initial agreement. Further, the provision that any profits of the breach of confidentiality shall constitute liquidated damages is the minimal indemnity provision that could reasonably be deemed appropriate. The fact that this and other provisions of the master agreement apply to non-signatory members of Mrs. Lee's family is of no consequence because the agreement holds only Mrs. Lee liable for their conduct.[23]

Hugh also objects to the master agreement's provision that the record be sealed by order of Court, on the grounds that it binds persons not parties to the lawsuit. His interpretation of the master agreement is accurate but it represents merely the consent of the parties to the Order previously entered by the Court on January 23, 1978. The restrictions imposed upon Mrs. Lee's disposition of certain items of jewelry and personal letters that had been introduced as evidence at the trial are necessary incidents of their release from the custody of the Clerk, an act to which Hugh does not object.

■ The next subject of dispute is the master agreement's failure to address the desire of Mrs. Lee and Hugh to obtain a new trustee or advisory board for the Reliance Trusts. These trusts were formed by Mrs. Lee in 1941 for the benefit of her four children. In the January 16 agreement the Estate agreed to see what it could do about installing officers more to the liking of Hugh and Mrs. Lee. Upon reviewing the act establishing the trusts, the Estate concluded, and the Court agrees, that no one can effect the removal of the officers except the officers themselves, without terminating the trust.[24] Accordingly, reference to the substitution of trust officers was appropriately omitted from the master agreement.

At the close of the settlement conference the question of distribution of settlement funds was raised. The concern was that improved tax treatment could be obtained if any money destined for other members of Mrs. Lee's family went directly to them rather than passing through Mrs. Lee first. Mrs. Lee stated that at least half of the money would go to trust funds being established for her grandchildren. The Master Settlement Agreement provides that the entire amount shall be paid jointly to Mrs. Lee, her lawyers, her two living children, and the major children of her two deceased children.[25] The change is not a material one since Mrs. Lee and the other recipients of the funds have approved the manner of payment. Hugh has no proper interest in the matter.

■ The most significant subject of dispute is the scope of the releases. Hugh objects to the release of future claims against members of the other families which are not related to the subject matter of the lawsuit. And well he might object but for the fact that no such release is required by the master agreement. That agreement, like the January 16 agreement,

23. *See* Master Settlement Agreement at 12, Joint Exhibit 9 filed in the record of the December 7, 1978 Hearing.

24. *See* the Act of Donation of April 12, 1941, filed in the record on December 28, 1978.

25. *See* Joint Exhibit 8 filed in the record of the December 7, 1978 Hearing.

requires a release of all claims, present and future, arising out of the subject matter of the lawsuit—the relationship between Mrs. Lee and H. L. Hunt. However, only *existing* claims between members of the different families are released if they are not related to the lawsuit.

 The January 16 agreement provides that members of each family shall release all inheritance rights in the estates of members of the other families. Hugh claims that the January 16 agreement was intended to release only rights of intestate succession while the master agreement would cover testamentary rights, as well. All parties knew that the settlement agreement was to end all rights arising from the relationship between Mrs. Lee and H. L. Hunt. Obviously, this would include rights as heirs at law in the intestate succession of any member of the other families. Less obviously, it would include any right under a testamentary bequest referring to "brothers and sisters." It may be difficult to understand why so much energy would be expended regarding release of a right which could be changed at any time by the testator. Part of the debate is, no doubt, attributable to the difficulty of reviewing and amending the myriad wills and trust documents. However, all parties were also aware that the claim could be made that a certain member of one of the families no longer possessed testamentary capacity. Thus it was clearly understood that existing testamentary rights would also have to be released, allowing them to be specifically reestablished after the date of the settlement if the testator wished to include members of the other families. The Master Settlement Agreement is reasonably designed to fulfill that intent.

 Hugh also objects to one of the final provisions of the master agreement: "The conditions, terms, provisions and covenants contained in this agreement shall apply to, inure to the benefit of, and be binding upon the parties hereto, and their re-

spective heirs, successors, assigns, and legal representatives." [26] This provision adds nothing to what the law governing contracts already provides. See, e. g., La.Civ. Code arts. 1997, 1999.

 The final subject of dispute consists of Hugh's related objections to the choice of Texas law to govern the agreement, and to the waiver of future inheritance rights. Hugh properly asserts that Louisiana law looks with disfavor upon attempts to waive future inheritance rights. However, as none of the parties reside in Louisiana, that substantive policy is of no consequence. Article 10 of the Civil Code requires application of the law of the place where the contract is to have effect, which, in the case of the persons being released by Hugh, is Texas. Hugh does not claim that the waiver is void under the law of Texas.

 For the same reason, it is clear that the parties intended Texas law to govern the agreement. Under accepted canons of construction, the parties must be deemed to have intended to create an enforceable contract. A court should not lightly read an agreement in such a way as to frustrate this intent. To require application of Louisiana law would defeat the aim of the parties, most of whom reside in Texas. Accordingly, the Court finds that the Master Settlement Agreement properly reflects the intent of the parties to the January 16 agreement.

## CONCLUSION

Having found that Hugh S. Hunt is properly before this Court, that he executed a binding contract on January 16, 1978, and that this contract obligates him to execute the Master Settlement Agreement and accompanying documents, the Court does hereby order him to do so. Although at the December 7, 1978 hearing he agreed to waive the opportunity to comply with this Order, the Court will extend him a brief opportunity once more.

26. Master Settlement Agreement, at 15, Joint Exhibit 9 filed in the record of the December 7, 1978 Hearing.

If Hugh has not executed the documents by 5:00 O'Clock P.M. on Thursday, December 27, 1979, the Court will direct the Clerk to execute them in his place by a judgment to be submitted by counsel for the Estate on Friday, December 28, 1979.

## APPENDIX

### RULINGS ON EVIDENCE OF JANUARY 10, 1978

The defendant has posed objections to two general lines of proof offered by the plaintiff. First, H. L. Hunt having died, the defendant contends that Frania Tye Lee may not testify about any transactions with him because of the Texas Dead Man's Statute. Second, the defendant objects to any parol evidence to vary or interpret the terms of the 1942 settlement between the plaintiff and H. L. Hunt.

### TEXAS DEAD MAN'S STATUTE

Whether the plaintiff can testify regarding transactions, including marriage and settlement with H. L. Hunt is a matter of her competency as a witness. Rule 601, F.R.E., provides, in pertinent part:

"[I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law."

Because this Court sits in Louisiana, the question remains whether Texas or Louisiana law applies to determine her competency to testify about transactions with H. L. Hunt.

A federal court sitting in Louisiana must look to Louisiana's conflict of laws rules to determine whether a Louisiana court would apply the Texas Dead Man's Statute in a case before it. *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Louisiana courts subscribe to the view that competency of witnesses is a matter of procedure to be determined by the law of the forum state. *Honeycutt v. Indiana Lumbermens Mutual Insurance Co.*, 130 So.2d 770 (La.App.3d Cir. 1961). In

*Honeycutt,* the court expressly declined to apply the Texas Dead Man's Statute to a case arising out of an accident that occurred in Texas. A Louisiana court would apply its own Dead Man's Statute to a case in Louisiana.

The Louisiana Dead Man's Statute is contained in La.R.S. 13:3721, 3722:

"§ 3721.

"Parol evidence shall not be received to prove any debt or liability of a deceased person against his succession representative, heirs, or legatees when no suit to enforce it has been brought against the deceased prior to his death, unless within one year of the death of the deceased:

"(1) A suit to enforce the debt or liability is brought against the succession representative, heirs, or legatees of the deceased . . . ."

"3722.

"When parol evidence is admissible under the provisions of R.S. 13:3721 the debt or liability of the deceased must be proved by the testimony of at least one creditable witness other than the claimant, and other corroborating circumstances."

Plaintiff brought this action on November 11, 1975. H. L. Hunt, the decedent, died on November 29, 1974. Thus, plaintiff has complied with La.R.S. 13:3721(1). Moreover, plaintiff intends to introduce evidence complying with La.R.S. 13:3722.

The objection to testimony based upon any Dead Man's Statute must be OVERRULED.

### PAROL EVIDENCE REGARDING SETTLEMENT

On January 24, 1942, the plaintiff entered into a compromise and release with H. L. Hunt. The plaintiff wishes to introduce extrinsic evidence to show the extent of the compromise. The defendant asserts that the document is an unambiguous written contract, so that any extrinsic evidence regarding interpretation of the agreement is barred by the parol evidence rule. The

defendant admits that Mrs. Lee may introduce extrinsic evidence to substantiate her claim that H. L. Hunt fraudulently induced her to enter into the agreement.

A federal district court must apply the conflict of laws rules of the forum state when state law supplies the rule of decision. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Whether a Louisiana court would apply its own law or Texas law to the contract in question, the result is the same. Parol evidence is inadmissible to vary the terms of the written contract and the effect of the contract must be decided by the Court, not the jury.

The contract in question is clear on its face. It begins by describing the claims giving rise to the compromise:

"WHEREAS, the undersigned, Frances Tye, a feme sole, now residing in the State of California, but temporarily located in Dallas, Dallas County, Texas, has made and is making and is asserting claims for damages against H. L. Hunt, a resident citizen of Dallas, Dallas County, Texas, and has made and is making and asserting claims to an interest in property heretofore owned and now owned and standing in the name of H. L. Hunt, basing and urging said claims for damages against the said H. L. Hunt and in and against property owned, claimed or held by him, in part on the ground of her social and intimate relations with him, the said H. L. Hunt, and asserting such social and intimate relations have heretofore existed over a long period of time. . . ."

Then it describes the consideration for the compromise. Finally, it delineates in clear terms the scope of the claims released as a result of the compromise:

"And in consideration thereof, I, the undersigned, Frances Tye, a feme sole, have released, discharged and quitclaimed, and do hereby release, discharge, and quitclaim and declare fully satisfied my every claim, right or demand of any kind or character whatsoever in law or equity against him, the said H. L. Hunt, and against any property owned or claimed by him or standing in his name now, heretofore, or which may hereafter be owned or claimed by him, whether the grounds or basis for any such claim for damages or right or demand is stated herein or not, releasing all such claims, assertions of right against him or his said property as fully and completely as though I had never known the said H. L. Hunt or had any kind or character of transaction or contract with him whatsoever. . . ."

Under Louisiana law, parol evidence may not be admitted to contradict or alter the terms of a written agreement. La.Civ.Code art. 2276. Much of the evidence that plaintiff intends to offer would tend to show that the settlement was not intended to compromise all of plaintiff's claims. Such evidence would be against or beyond the terms of the contract, and article 2276 would exclude it.

Although interpretation of the contract may involve certain questions of fact, the clear language of the act would prevent reasonable men from differing as to its scope and effect. The contract therefore presents no issue of fact for the jury to determine. If the settlement was valid, it released any claim to property of H. L. Hunt by virtue of any relationship between him and Frania Tye. It does not defeat her right to be declared the putative wife of H. L. Hunt if she can establish the elements of that claim, but it bars her recovery of any property by virtue of a declaration that she was his putative wife.

Under Texas law, the parol evidence rule is a matter of substantive law. *Harville Rose Service v. Kellogg Co.*, 448 F.2d 1346 (5th Cir. 1971). Under the rule, all prior and contemporaneous negotiations and promises are merged with the written contract. No prior or contemporaneous statements or writings may be used to vary or contradict the written contract. *Id.* The written contract embodies the complete agreement between the parties. *Id.*

Under Texas law, if a written contract is not ambiguous its construction is a question of law for the court alone. *Tower Contracting Co., Inc. v. Flores*, 302 S.W.2d 396 (Tex.1957); *St. Joseph Professional Bldg. Corp. v. American National Ins. Co.*, 511 S.W.2d 578 (Tex.Civ.App.Houston 1974, writ refused n. r. e.). The contract in question is clear. It bars the action in the manner described above, if it is valid.

That plaintiff cannot introduce extrinsic evidence to vary or explain the contract does not mean that she cannot use extrinsic evidence to attack its validity. Plaintiff has asserted that H. L. Hunt fraudulently induced her to compromise her claim. She may introduce parol evidence to substantiate her claim under both Texas and Louisiana law.

Under Texas law or Louisiana law, a person claiming fraud must prove a material misrepresentation or a material nondisclosure as an essential element of the claim. In the settlement of a lawsuit, the potential recovery and risk of loss are material facts. To evaluate the materiality of statements or omissions in the settlement, the jury must know what claims were being settled. Thus, testimony about the basis of the claims may *not* be admitted to prove the terms of the settlement, but it *may* be admitted for the jury to determine what facts would be material to a person settling the particular kind of claim in question.

One of plaintiff's key witnesses about the settlement is Wright Matthews, the attorney who represented her during the settlement negotiations. Much of the testimony in his deposition concerns what the parties intended to settle or not to settle. Testimony concerning the intent or the effect of the settlement or the legal basis for the claim would be inadmissible, being barred by the parol evidence rule. However, testimony concerning the substance of her claim or a description of the properties in which she claimed an interest would be admissible to establish the materiality of the alleged nondisclosure of the value of the purported putative community.

Some specific examples will illustrate the general principles embodied in this ruling. If Mrs. Lee's counsel asked Mr. Matthews, "Why did Mrs. Lee want to settle with Mr. Hunt?", or "Mr. Matthews, did you think that the settlement and release disposed of all of Mrs. Lee's claims against H. L. Hunt?", the Court would sustain an objection because the answer to the questions would be parol evidence about the intent or effect of a clear written contract. On the other hand, if counsel asked Mr. Matthews, "When the settlement mentions claims by Mrs. Lee to property of H. L. Hunt, what facts did she claim were true at the time of the settlement?", or, "What properties did she claim an interest in?", the Court would overrule an objection because the questions seek to establish the nondisclosure of a material fact, thus relating to the claim that the settlement was procured by fraud.

Counsel shall prepare for future examination of witnesses in a manner consistent with this ruling.

## MEMORANDUM RULING OF JANUARY 11, 1978

Frania Tye Lee, the plaintiff, claims to have been the putative wife of the late H. L. Hunt. In addition, she contends that she remained his putative wife until the date of his death because, under Louisiana law, a putative marriage ends only upon a judicial declaration of nullity, and their putative marriage never was annulled. There is no Louisiana Supreme Court case in which the decision turned on whether a putative marriage terminates on the cessation of good faith or upon a judicial declaration of nullity. In dicta, a majority of the cases imply that a putative marriage ends when the good faith of the innocent spouse ceases. *Ray v. Knox*, 164 La. 193, 113 So. 814 (1927); *Clendenning v. Clendenning*, 3 Mart (N.S.) 438 (1825); *Succession of Choyce*, 183 So.2d 457 (La.App.2d Cir. 1966); *Succession of Hopkins*, 114 So.2d 742 (La.App. 1st Cir. 1959). *See also Evans v. Eureka Grand Lodge*, 149 So. 305 (La.App. 2d Cir. 1933); *Hunter v. Richardson*, 346 F.Supp. 123 (M.D.La.1972). In other cases, the Louisi-

ana Supreme Court has quoted French jurists, who imply that a putative marriage ends only upon a judicial declaration of nullity. *Cortes v. Fleming*, 307 So.2d 611 (La.1973); *Smith v. Smith*, 43 La.Ann. 1140, 10 So. 248 (1891).

In this case, the plaintiff admits that she learned of the impediment to her alleged marriage to H. L. Hunt in 1934 at the latest. The marriage never was declared null by a court. The case, therefore, squarely presents the issue whether, under Louisiana law, a putative marriage terminates upon the cessation of good faith by the innocent spouse or whether a putative marriage terminates only upon a judicial declaration of nullity.

Article 86 of the Louisiana Civil Code states, "The law considers marriage in no other view than as a civil contract." One requisite to a valid civil contract is that the parties be legally capable of contracting marriage with each other. La.Civ.Code art. 1779. Article 90 of the Civil Code is a specific application of the general principles expressed in articles 86 and 1779:

"As the law considers marriage in no other view than that of a civil contract, it sanctions all those marriages where the parties, at the time of making them, were:

\* \* \* \* \* \*

"2. Able to contract . . .."

With respect to the ability to contract a marriage, article 93 of the Civil Code states, "Persons legally married are, until a dissolution of marriage, incapable of contracting another . . .." Finally, article 113 clearly implies, and Louisiana doctrine affirms, that a marriage contracted in contravention of article 93 is absolutely null.

Louisiana law acknowledges that principles of law may be harsh in their absolute extension. Thus, article 21 of the Civil Code states:

"In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent."

The Louisiana Civil Code provisions dealing with putative marriage, articles 116–18, are derived from the substantially similar provisions of the Code Napoleon. As the distinguished French jurist Marcel Planiol relates, the putative marriage doctrine originated as a creature of Canon Law. The doctrine was a palliative to the harshness of the effects of nullity due to marriage within prohibited degrees of relationships. 1 M. Planiol, Traite Elementaire de Droit Civil no. 1094 at 615 (La.St. L.Inst. transl. 1959) [hereinafter cited as Planiol]. The doctrine clearly is a matter of natural law and reason.

Articles 116–18 represent specific application of the equitable principle of article 21 in the case of a person who innocently has contracted an absolutely null marriage:

"Art. 116. A married person to whose prejudice a second marriage has been contracted can sue for the nullity of such marriage, even during the life of the other party with whom he or she had contracted the first marriage. . . .

"Art. 117. The marriage, which has been declared null, produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith.

"Art. 118. If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor, and in favor of the children born of the marriage."

Read together, the three articles envision the situation in which the legal spouse of a party to a bigamous marriage wishes to cause the bigamous relationship to end. The articles assume that the innocent spouse or spouses remain innocent, but that the legal spouse seeks a termination of the allegedly bigamous relationship. The articles make no express provision for spouses, once innocent, who themselves desire to terminate a bigamous relationship upon discovery that the relationship is or may be bigamous. General principles of equity

must govern the termination of the civil effects of the putative marriage in that situation.

A marriage contracted when one spouse is a party to a previously undissolved marriage is absolutely null; however, equity demands that innocent persons not be injured through an innocent relationship. Natural law and reason will protect innocent persons so long as they deserve or need the protection of the law. Once the need or the reason for a protection ceases to exist, natural law no longer should extend its shield.

When an innocent party to a bigamous marriage discovers the true nature of the relationship, any further action to develop or sustain the relationship is not innocent. In addition, after discovery of the impediment any reliance on the marital relationship would be misplaced. The party no longer can be considered innocent once he or she learns of the impediment. After discovery of the impediment, he or she is not deserving of or in need of the protection of natural law. Thus, natural law should not protect the once innocent spouse by preserving the civil effects of the marriage after the spouse has discovered an impediment to the marriage.

Natural law and equity dictate that when two parties engage in a bigamous marriage, and one or both of them are innocent, the civil effects of the marriage continue as to the innocent party or parties only until the party or parties cease to be innocent. In the context of the instant case, the civil effects of the purported putative marriage ceased when Mrs. Lee, the innocent spouse, learned of the impediment to her purported marriage to Franklin or H. L. Hunt.

Mrs. Lee has cited Planiol as authority that a putative marriage ceases only upon judicial declaration of nullity. Truly, Planiol addresses the question:

"Thus, it is recognized that the null marriage, contracted in good faith, produces its effects, as if it had been valid until the judicial sentence declares it to be null. The sentence terminates the marriage, as would a divorce. The marriage henceforth produces no effect. But those it had produced subsist. . . . In other words, on account of the good faith of the parties, the nullity takes place without retroactivity. Such a marriage is called a putative marriage (*putativus*, deemed to be what it is not)." Planiol no. 1093 at 615.

Moreover, Planiol states specifically that the effects of the putative marriage cease from the date of the sentence of nullity. Planiol no. 1110 at 621.

Planiol's principle of cessation, however, is not without exception. He opines that a bigamous marriage is absolutely null, so that a second *valid* marriage by the innocent spouse would not be forbidden by the incapacity of the spouse due to the putative marriage. Planiol no. 1017 at 583. Thus, at least the civil effect of the incapacity to marry would cease when the innocence of the spouse ceased by marriage to another person. Clearly, in theorizing about putative marriages, Planiol did not intend to cover every situation of termination of a putative marriage. Natural law and reason still must supply the resolution of the controversy in the instant case.

As additional authority for her assertion that a putative marriage ends only upon a judicial declaration of nullity, the plaintiff cites *Cortes v. Fleming*, 307 So.2d 611 (La. 1973), in which the Louisiana Supreme Court held that a putative wife is entitled to permanent alimony upon a judicial declaration of nullity of her marriage. In *Cortes*, however, whether the marriage terminated with the cessation of good faith was not at issue. The Supreme Court held that a wife's right to permanent alimony is a civil effect of marriage that accrues at the time the marriage is *confected*. The case does not hold that a wife's right to permanent alimony arises at the *termination* of marriage. Thus, in *Cortes* it did not matter whether the civil effects of marriage terminated when good faith ceased or when the court declared the marriage null. The right to permanent alimony accrues at the time of a marriage in good faith.

Moreover, the court in *Cortes* cited Planiol with approval to support its decision. Interestingly, Planiol specifically concluded that permanent alimony was not a civil effect of a putative marriage. Planiol no. 1111 at 622. *Cortes* does not support the contentions of the plaintiff.

■ Under Louisiana law, the civil effects of a bigamous putative marriage terminate as to a once innocent spouse when he or she learns of the impediment to the putative marriage. In the context of the instant case, the consequences of the termination would include a cessation of any rights to community property acquired during the alleged putative marriage and a cessation of an incapacity to contract on the part of the plaintiff and H. L. Hunt as a result of their alleged putative marriage. Hence, the settlement agreement is *not* null because the parties were incapable of contracting with each other.

### MEMORANDUM RULING OF JANUARY 13, 1978

■ The Court already has held that the Louisiana Dead Man's Statute, La.R.S. 13:3721–22, applies to the instant case. Mrs. Lee has complied with § 3721, but she still must present evidence on her claim that meets the requirements of § 3722:

"When parol evidence is admissible under the provisions of R.S. 13:3721 the debt or liability of the deceased must be proved by the testimony of at least one creditable witness other than the claimant, and other corroborating circumstances."

One of the fraud claims that Mrs. Lee has made is that H. L. Hunt promised her that in his will he would acknowledge her as his putative wife and he would treat her children equally with the children of his first marriage. H. L. Hunt allegedly made the promise during a session "behind closed doors" at the 1942 negotiating sessions at the Adolphus Hotel in Dallas. Unless she can produce another "creditable" witness and "other corroborating circumstances" to prove he made the promise, she may not assert her claim of fraud based on the promise.

Of the witnesses for plaintiff, only Martha Kreeger and Hugh Hunt have mentioned a promise about the will. Mrs. Kreeger testified as follows:

" 'Q. You didn't hear Mr. Hunt make any such representations or promises?

" 'A. Not quite that way, but he said, "Oh, you know, Martha, I'm always going to take care of Frania. You know I love Frania; I'll always take care of her." That was about it, but he didn't say, "I promise." ' " Transcript at 228 1. 15–20.

Hugh Hunt denied any personal knowledge of the promise:

"Q. Mr. Hunt never made any promise to you as to what he would do for you in his will, did he?

"A. No." Transcript at 338 1. 19–21.

Neither of these witnesses can constitute the additional "creditable" corroborating witness.

Unless Wright Matthews can corroborate her testimony about the promises, she cannot recover for fraud based on the asserted promise. In his testimony he did not mention any promise or hint of promise about acknowledging the marriage or the children. Thus, the plaintiff is not entitled to a jury instruction concerning the promise, and her attorney may not mention any such promises in his closing argument.