**Mrs. Frania Tye LEE, Plaintiff,**

v.

**Ray Lee HUNT, Executor of the Estate of H. L. Hunt, Defendant–Appellee,**

v.

**Hugh S. Hunt, Defendant–Appellant.**

No. 80–3211

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

Dec. 1, 1980.

Rehearing Denied Jan. 13, 1981.

Thomas A. Rayer, New Orleans, La., for defendant–appellant.

Cook, Clark, Egan, Yancey & King, Sidney E. Cook, Shreveport, La., Don L. Case, Dallas, Tex., Lawrence E. Donohoe, Jr., Lafayette, La., for Ray Lee Hunt.

Before GEE, RUBIN and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This appeal arises from a suit originally filed in 1975 by Mrs. Frania Tye Lee, who is the mother of the Appellant herein, Hugh S. Hunt (a/k/a Hugh Lee Hunt, hereinafter "Hugh Hunt"), against the executor of the Estate of H. L. Hunt, alleging a putative marriage with the late H. L. Hunt and, as such, an entitlement to a community interest in property acquired during the alleged relationship. After lengthy litigation on jurisdiction, venue and related matters, *Lee v. Hunt*, 410 F.Supp. 329 (M.D.La.1976); *Lee v. Hunt*, 415 F.Supp. 245 (M.D.La.1976); *Lee v. Hunt*, 431 F.Supp. 371 (W.D.La. 1977), the matter was finally tried before a jury between January 9 and January 16, 1978. On January 16, counsel for the respective parties requested a conference in chambers with the trial judge, at which time they advised the court that they had reached an agreement of settlement of the pending lawsuit. The judge requested that the parties dictate the terms of the agreement to the court reporter in his chambers. During a brief recess the dictated settlement was transcribed, and eleven persons—including Hugh Hunt—thereafter signed it. The district court discharged the jury and, on January 23, 1978, entered a judgment of dismissal with prejudice based upon the January 16 settlement. Pursuant to this agreement, counsel for the Hunt Estate then prepared a "master settlement agreement" which spelled out in greater detail the agreement among the parties. All of the necessary parties (nineteen in all) signed this document, with the exception of Hugh Hunt.

Having failed to persuade Hugh Hunt, counsel for the Hunt Estate filed a petition to enforce the settlement agreement on September 26, 1978. On the same date the district court joined Hugh Hunt as a party defendant to the action, pursuant to Fed.R. Civ.P. 19(a), and ordered him to show cause why the settlement should not be enforced. In response to the petition and these orders, Hugh Hunt filed two motions: (1) to vacate or modify judgment, Fed.R.Civ.P. 60(b); and (2) to dismiss the petition pursuant to Fed.R.Civ.P. 12(b)(1), (2), (5) and (6), that is, for lack of subject matter and personal jurisdiction, for insufficiency of service of process, and for failure to state a claim upon which relief can be granted. On December 7, 1978, the district court held a plenary hearing on the petition. At that time counsel for Hugh Hunt withdrew the Rule 60(b) motion. On December 19, 1979, the district court entered a memorandum ruling, *Lee v. Hunt*, 483 F.Supp. 826 (W.D. La.1979), in which it rejected all of Hugh Hunt's Rule 12(b) claims and held that the January 16 settlement agreement was binding on Hugh Hunt and that all of the provisions of the master settlement agreement were within the contemplation of the earlier agreement. Accordingly, the court entered final judgment on December 27, 1979, ordering Hugh Hunt to execute the master settlement agreement.

Hugh Hunt now appeals from this order. He does not argue with the district court's rulings under Rule 12(b) and does not seek to reassert his Rule 60(b) motion. Rather, he raises a confused variety of factual and legal challenges to the memorandum ruling and order of the district court. These arguments fall roughly into the following categories: (1) that there was no "meeting of the minds" and therefore no contract in the January 16 meeting; (2) that he may avoid the contract under doctrines of duress, undue influence and failure of consideration; (3) that the master settlement agreement is not a reasonable expression of the terms of the January 16 agreement; and (4) that certain provisions of the agreement are *contra bones mores* under Louisiana law. We deal with these arguments in turn after determining the applicable state law and reviewing the circumstances of the January 16 agreement.

## I. CHOICE OF LAW

A threshold question in this case is the choice of law by which the settlement agreement should be judged. Although federal courts possess the inherent power to enforce agreements entered into in settle-

ment of litigation,[1] the construction and enforcement of settlement agreements is governed by principles of state law applicable to contracts generally. *E. g., Florida Education Association, Inc. v. Atkinson,* 481 F.2d 662 (5th Cir. 1973). In accordance with *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and its progeny, federal courts must, in such cases, apply the choice of law rules of the forum state, in this case Louisiana. Thus, the district court correctly referred to La.Civ.Code Art. 10, which provides, in pertinent part:

> The form and effect of public and private instruments are governed by the laws and usages of the places where they are passed or executed.

It is not immediately clear how the district court went from this provision to the conclusion that Texas law applies in this case; the contract of settlement was executed in Louisiana.[2] Nevertheless, a close analysis of the applicable choice of law principles convinces us that Texas law does govern the interpretation of the settlement agreement.

Louisiana choice of law rules (and their interpretation by federal courts) have been in a state of confusion for some time. During the 1960's a line of cases evolved in both the intermediate Louisiana appellant

courts[3] and in federal courts in this circuit[4] which applied a more modern approach to choice of law rules–looking to the "center of gravity," or to the state with the "most significant contacts"–rather than applying the literal wording of the Louisiana Code. *See generally Restatement (Second) of Conflict of Laws* §§ 6, 188 (1971). But this approach was rejected by the Louisiana Supreme Court in *Johnson v. St. Paul Mercury Insurance Co.,* 236 So.2d 216 (La.1970). We subsequently recognized Louisiana's adherence to the strict wording of Article 10 in *Lester v. Aetna Life Insurance Co.,* 433 F.2d 884 (5th Cir.), *cert. denied,* 402 U.S. 909, 91 S.Ct. 1382, 28 L.Ed.2d 650 (1971), but upheld the district court's application of the modern approach by carving out an exception to the rule of *Klaxon.* We held that we were not bound by the choice of law rule of the forum state where only a "false conflict" exists, that is, where only one state has any legitimate interest in the case. Our holding was not an attempt to overrule the Louisiana Supreme Court's strict interpretation of Article 10, or to eviscerate *Klaxon*; rather, we sought to except the general *Klaxon* rule only in those extreme cases where "'one of two states related to a case has a legitimate interest in the application of its law and the

1. *E. g., Pearson v. Ecological Science Corp.,* 522 F.2d 171 (5th Cir. 1975), *cert. denied sub nom. Skydell v. Ecological Science Corp.,* 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976); *Massachusetts Casualty Insurance Co. v. Forman,* 469 F.2d 259 (5th Cir. 1972); *Cia Anon Venezolana de Navegacion v. Harris,* 374 F.2d 33 (5th Cir. 1967).

2. The district court reasoned as follows, 483 F.Supp. at 837:

> The final subject of dispute consists of Hugh's related objections to the choice of Texas law to govern the agreement, and to the waiver of future inheritance rights. Hugh properly asserts that Louisiana law looks with disfavor upon attempts to waive future inheritance rights. However, as none of the parties reside in Louisiana, that substantive policy is of no consequence. Article 10 of the Civil Code requires application of the law of the place where the contract is to have effect, which, in the case of the persons being released by Hugh, is Texas. Hugh does

not claim that the waiver is void under the law of Texas.

Despite this analysis, the district court relied on Louisiana law elsewhere in its opinion. 483 F.Supp. at 834, 835, 837. Similarly, both parties to this appeal rely inconsistently on both Louisiana and Texas law.

3. *E. g., Universal C.I.T. Credit Corp. v. Hulett,* 151 So.2d 705 (La.App., 3rd Cir. 1963) (Judge Tate); *Doty v. Central Mutual Insurance Co.,* 186 So.2d 328 (La.App., 3rd Cir. 1966) (concurring opinion of Judge Tate); *Blanchard v. Blanchard,* 180 So.2d 564 (La.App., 3rd Cir. 1965) (concurring opinion of Judge Tate). In these cases Judge Tate found authority for the modern approach in the second sentence of La.Civ.Code Art. 10, which provides:

> But the effect of acts passed in one country to have effect in another country, is regulated by the laws of the country where such acts are to have effect.

4. *E. g., Franklin v. Texas International Petroleum Corp.,* 324 F.Supp. 808 (W.D.La.1971).

other has none.'" 433 F.2d at 890. Our exception was, however, rejected by the Supreme Court in *Day and Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3, *overruling Challoner v. Day and Zimmerman, Inc.*, 512 F.2d 77 (5th Cir. 1975), in a short *per curiam* opinion which concluded:

By parity of reasoning, the conflict–of–laws rules to be applied by a federal court in Texas must conform to those prevailing in the Texas state courts. A federal court in a diversity case is not free to engraft onto those state rules exceptions or modifications which may commend themselves to the federal court, but have not commended themselves to the State in which the federal court sits.

423 U.S. at 4, 96 S.Ct. at 168. *See generally* C. Wright, *Law of Federal Courts* § 57, at 264–65 (3rd ed. 1976).

Following *Challoner*, we are bound by the interpretation of Article 10 adopted by the Louisiana courts. Subsequent to *Challoner*, however, the Louisiana Supreme Court overruled *Johnson* in favor of a more modern approach to conflicts of law. *Jagers v. Royal Indemnity Co.*, 276 So.2d 309 (La. 1973). Unfortunately, *Jagers* is far from clear. *Jagers* apparently created an exception to the strict Louisiana choice of law rules by holding that only a "false conflict" existed in the case; that is, the Louisiana Supreme Court adopted the reasoning of this court in *Lester* and *Challoner* and held that conflicts of law principles did not apply in cases of "false" conflicts.[5] But *Jagers* can be read to go even farther than this. After holding that the state choice of law rule did not apply in cases of false conflict, the court cryptically stated:

That some modern methods for determining whether to apply the law of the forum are faulty in some respects should not deter a court in the application of the law of the forum to its citizens, when not otherwise prohibited.

A footnote to this statement is as follows:

For choice–of–law principles, see Restatement, Second, Conflict of Laws, § 6 (1969):

"(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law,

"(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

"(a) the needs of the interstate and international systems,

"(b) the relevant policies of the forum,

"(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

"(d) the protection of justified expectations,

"(e) the basic policies underlying the particular field of law,

"(f) certainty, predictability and uniformity of result, and

"(g) ease in the determination and application of the law to be applied."

276 So.2d at 312.

Shortly after *Jagers*, this court was faced with a Louisiana choice of law question in *Brinkley & West, Inc. v. Foremost Insurance Co.*, 499 F.2d 928 (1974). We concluded that the Louisiana Supreme Court's opinion in *Jagers* in effect adopts the analysis of the *Restatement* as the law of Louisiana. Still the *Restatement* arguably allows for the strict interpretation of Article 10 in cases involving a real (as opposed to "false") conflict of law, since the interest analysis is to be used only where there is no statutory directive (*i. e.*, Article 10) to the contrary. But after finding that the conflict in *Brinkley & West, Inc.* was a real one, we went on to apply the interest analysis set forth in the second paragraph of the *Restatement* provision, thereby implicitly finding that Article 10 is not to be

---

**5.** In *Challoner*, the Supreme Court rejected the "false conflicts" doctrine as an exception to the rule of *Klaxon*. But it left the door open for state courts to adopt the doctrine as an exception to their own local choice of law statutes. *Challoner v. Day and Zimmerman, Inc.*, 423 U.S. 3, 5, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975) (Blackmun, J., concurring).

strictly construed even in cases of real conflicts. Since *Brinkley & West, Inc.* was decided, the *Jagers* opinion has been interpreted by at least two intermediate appellate courts in Louisiana. *Brannon v. Babin*, 366 So.2d 955 (La.App., 1st Cir. 1978); *Sutton v. Langley*, 330 So.2d 321 (La.App., 2d Cir.), *writ denied*, 332 So.2d 805, 820, and 333 So.2d 321 (1976). In both cases the court held that the modern "interest analysis" is the correct choice of law rule in Louisiana—whether the conflict is "real" or "false." We can therefore reaffirm our analysis in *Brinkley & West, Inc., supra*, and conclude (1) that the current approach to the choice of law in Louisiana is that embodied in the *Restatement, supra*, and (2) that under that approach the interest analysis of the second paragraph of the *Restatement* is to be applied in all cases, regardless of the literal reach of Article 10.

■ The district court found that Texas has a greater interest in this settlement than does Louisiana and that the law of Texas accordingly must govern the interpretation and validity of the settlement agreement. As virtually all of the parties to the settlement agreement are residents of Texas (only Mrs. Lee is a resident of Louisiana), and the bulk of the property at issue is located in Texas, the district court's conclusion is clearly correct. We note that the parties do not challenge that holding.[6]

## II. THE JANUARY 16 AGREEMENT

The judge began the January 16 meeting in his chambers by explaining the purposes of the conference as follows:

> Now, as I understand it and for the purpose of the record, there have been discussions concerning a negotiated settlement of this lawsuit, that the parties are

in agreement and for the purpose of placing the terms of the agreement in writing, the court has made use of and is now making use of the instantaneous court reporters who will transcribe now the terms of the settlement, which will be then typed and after being typed will be signed by all parties to the lawsuit and other members of both families will have a place to sign their names indicating their full agreement with the terms.

Record at 3456. The judge then requested counsel for the parties to list the provisions of the settlement agreement. Before the parties listed these terms, the judge stated again:

> Well, I am providing these offices for the purpose of the parties and when you all have reached an agreement and are ready to execute it, then I want to supervise it.

Record at 3456. The attorney who stated the agreement began by saying the following:

> Following the negotiations between all parties that are present here and that the parties here represent that they are authorized to speak on behalf of the other members of their family or respective families and in order to bring this entire litigation to a conclusion and in addition to this litigation any other claims of any nature or kind which any member of the Hunt family may have one against the other of any nature or kind, the following agreement has been reached.

Record at 3458. During the course of the discussion, Hugh Hunt expressed some doubt as to his ability to legally sign away his children's rights. And, when attorneys for the Hunt Estate said that each branch of the Hunt family would release all of its rights of inheritance from other branches of the family, Hugh Hunt disagreed that this

---

**6.** *Louisiana will honor a stipulation of the parties regarding the choice of law. La.Civ.Code Art. 11; Fine v. Property Damage Appraisers, Inc., 393 F.Supp. 1304 (E.D.La.1975). The master settlement agreement does provide that Texas law shall govern the agreement, and the district court adds that such was the implicit understanding of the original agreement (since the parties must have intended an enforceable contract, and under Louisiana law, according to*

Hugh Hunt's argument, there is some doubt about this contract's validity). 483 F.Supp. at 837. The choice of law is not mentioned in the January 16 conference; however, and there is no indication that anyone was aware of Hugh Hunt's arguments under Louisiana law at that time. Since the applicable choice of law rule comes to the same result, we need not reach this question.

had been the understanding reached prior to the conference. The court appears to have agreed with counsel for the Hunt Estate. The following colloquy then took place:

> THE COURT: In other words, all of the parties who have discussed this matter up to this point have understood that this was a final settlement.

> MR. HUGH LEE HUNT: Your honor, I want to make a statement. I am here because my mother is taking four pills a day for her heart. I have been advised by my attorneys that if she dies, her rights die and I will sign whatever papers you want, and I would like to leave the chambers, please.

> THE COURT: You may, sir.

> (Thereupon Mr. Hugh Lee Hunt left the chambers.)

Record at 3468. At this point the rest of the parties completed their statement of the terms of the agreement. At the conclusion of the conference, the judge had the transcript typed up. At the end of the transcript is a place for the signatures of all the parties; Hugh Hunt's signature appears there, along with that of other parties to the agreement.

### III. THE "MEETING OF THE MINDS" IN THE JANUARY 16 AGREEMENT

Hugh Hunt contends that there was no "meeting of the minds" in the January 16 conference, and that the transcript of that meeting therefore cannot represent a final binding contract under applicable state law. Most of this argument consists of challenges to factual findings of the district court. These findings include: (1) that Hugh Hunt did intend to bind himself by his signature to the January 16 transcript; and (2) that he understood the January 16 agreement to be a complete statement of the terms of the settlement. 483 F.Supp. at 835. Insofar as material facts are disputed in the course of a proceeding to enforce a settlement agreement, the district court should hold a hearing to obtain evidence on the factual matters in dispute. *Massachusetts Casualty Insurance Co. v.*

*Forman*, 469 F.2d 259 (5th Cir. 1972). The trial judge did hold a full hearing on this petition and heard testimony from Hugh Hunt and from his mother, Mrs. Lee. Factual findings pursuant to such a hearing must be accepted unless they are "clearly erroneous" within the meaning of Fed.R. Civ.P. 52(a). *Pearson v. Ecological Science Corp.*, 522 F.2d 171 (5th Cir. 1975), *cert. denied sub nom. Skydell v. Ecological Science Corp.*, 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976). On the basis of the record, and in particular the transcript of the January 16 meeting, we cannot say that these findings were clearly erroneous.

Hugh Hunt also argues that it was his understanding that counsel for the Hunt Estate would require the signature of his wife and of his descendants, while in fact the Estate did not insist on these signatures. The district court incorrectly relied on Louisiana law in holding that this misunderstanding did not negate the "meeting of the minds" in the January 16 agreement. 483 F.Supp. at 834–35. But the result is no different under Texas law. Whether these signatures would be required is not relevant to Hugh Hunt's obligations. They were purely for the benefit of the Hunt Estate, as they served only to waive rights against the Estate and those claiming under it. The Estate therefore has the right to waive the requirement without forfeiting any other right under the agreement; under Texas law, a party to a contract may waive the performance of any contractual provision that is to his benefit. *E. g., Gulf Production Co. v. Continental Oil Co.*, 164 S.W.2d 448 (Tex.1942). Nevertheless, Hugh Hunt maintains that he *believed* that he would not be bound until his wife and descendants signed, and that consequently he signed the transcript under a mistake of law. In the first place, mistake generally does not excuse contractual obligations unless it is mutual (or is induced by the other party). *E. g., Anderson Brothers Corp. v. O'Meara*, 306 F.2d 672 (5th Cir. 1962). There is no suggestion in the record that any other party to the agreement was under the same misimpression of Texas law, or that any party induced Hugh Hunt's misunderstanding.

In the second place, a pure mistake of law generally cannot excuse contractual obligations. *E. g., Hall v. Hays,* 441 S.W.2d 275 (Tex.Civ.App.–El Paso 1969, no writ history); *Ussery v. Hollebeke,* 391 S.W.2d 497 (Tex.Civ.App.–El Paso 1965, writ ref. n. r. e.); *Harris v. Sanderson,* 178 S.W.2d 315 (Tex.Civ.App.–Eastland 1944, writ ref. w. o. m.). Therefore, the fact that Hugh Hunt may have mistakenly understood the applicable law to exempt him from the binding force of his signature cannot excuse him from the settlement agreement. ·

## IV. DURESS, UNDUE INFLUENCE, AND FAILURE OF CON-SIDERATION

 Hugh Hunt urges several affirmative defenses to any contract which may have been formed in the January 16 conference. These defenses center around the emotional strain and pressures of the settlement negotiations:

> The Court should consider the posture in which Hugh Hunt found himself at that tense and compelling moment in this already emotionally charged litigation. He unhappily discovered himself inexorably drawn into the vortex of these settlement negotiations, without benefit of personal legal counsel. He thusly became torn between his own innermost feelings of · dismay at what seemed to be transpiring and the unclear effects thereof on his personal welfare, as opposed to what legal counsel for his mother were strongly pressing upon him as being in her best interests.

*Appellant's Brief* at 25. Hugh Hunt may indeed have been under great pressure at this time, and the record shows that the emotional strain caused him to leave the meeting before it was completed. But these facts do not establish either duress or undue influence under Texas law. One state court has defined duress as follows:

> [O]ur courts of Texas have consistently followed the rule, as a matter of law, that (1) there can be no duress unless there is a threat to do some act which the party threatening has no legal right to do; (2) there must be some illegal exaction or some fraud or deception; (3) the restraint must be imminent and such as to destroy free agency without present means of protection.

*Tower Contracting Co., Inc., of Texas v. Bruden Brothers, Inc.,* 482 S.W.2d 330, 335 (Tex.Civ.App.—Dallas 1972, writ ref. n. r. e.). *See also Mitchell v. C.C. Sanitation Co.,* 430 S.W.2d 933 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref. n. r. e.); *Sanders v. Republic National Bank of Dallas,* 389 S.W.2d 551 (Tex.Civ.App.—Tyler 1965, no writ history). In order to prove undue influence, one must demonstrate that "persuasion, entreaty, importunity, argument, intercession, and solicitation" were so strong as to "subvert and overthrow the will of the person to whom they are directed." *DeGrassi v. DeGrassi,* 533 S.W.2d 81, 85 (Tex.Civ.App.—Amarillo 1976, writ ref. n. r. e.). *See Curry v. Curry,* 270 S.W.2d 208 (Tex.1954). Duress and undue influence are difficult defenses to establish. Certainly they are not suggested by the facts of this case; emotional strain and negotiation pressures are not by themselves enough to overcome the will of the party to a contract, and there is no evidence that they resulted from threats, illegal exaction, fraud or deception.

 Hugh Hunt makes the related argument that he received nothing in return for his signature on the transcript of the January 16 meeting. It is true that the agreement guaranteed him none of the final settlement amount, which was to be distributed in accordance with his mother's directions. But a party need not receive the benefit of a contract in order to be bound by it; it is enough that the party seeking to hold another to the contract suffer a legal detriment. So long as consideration is sufficient to support the contract, which party actually receives the consideration is irrelevant. *E. g., Loomis v. Skillerns–Loomis Plaza, Inc.,* 593 S.W.2d 409 (Tex.Civ.App.—Dallas 1980, no writ history); *Mercantile National Bank at Dallas v. Hudgens,* 412 S.W.2d 364 (Tex.Civ.App.—Ft. Worth 1967, writ ref. n. r. e.); *Minton v.*

*Riverside State Bank*, 399 S.W.2d 196 (Tex. Civ.App.—Ft. Worth 1966, no writ history).

## V. THE MASTER SETTLEMENT AGREEMENT

Hugh Hunt argues that the master settlement agreement which the district court ordered him to execute is not a reasonable statement of the terms of the January 16 agreement. The most important area of dispute centers around the scope of the releases contained in the final document. In brief, the master settlement agreement provides for the following releases:

1. Mrs. Lee and her descendants release the other parties from all claims arising from the relationship between Mrs. Lee and H. L. Hunt, including the birth of children from the relationship;

2. All parties accept as valid the duly probated will of H. L. Hunt;

3. All parties waive all forced heirship rights;

4. All parties agree not to prosecute or aid in the prosecution of suits arising from the relationship between Mrs. Lee and H. L. Hunt, including suits to determine status;

5. Mrs. Lee and her descendants assign to the other parties, in shares set forth in the agreement, their rights of inheritance from those parties, including all rights under state intestacy statutes and all testate claims that are not specifically established (or reestablished) after the date of the agreement; and all other parties assign their like rights to inheritances from Mrs. Lee and her descendants, to Mrs. Lee and her descendants in specified shares;

6. All parties agree to dismiss all on-going litigation among themselves, with the exception of one certain suit brought by Hugh Hunt in Georgia; and

7. Mrs. Lee and her descendants release any and all claims which they have against the other parties which do not arise out of the relationship between Mrs. Lee and H. L. Hunt but are already in existence at the date of the agreement; and the other parties likewise release Mrs. Lee and her descendants.

See Record at 3255–270. Hugh Hunt argues that these provisions depart from the intent of the earlier agreement by broadening the scope of the proposed releases. First, as Hugh Hunt describes the January 16 agreement it contemplated a release of only those claims which arose out of the alleged putative marriage between Mrs. Lee and H. L. Hunt, and did not call for a release of either present or future claims which are independent of that relationship. (*Cf.* paragraph 7 above.) Second, he maintains that the January 16 agreement did not contemplate the release of inheritance rights other than those derived from the relationship between Mrs. Lee and H. L. Hunt. Although it is not clear precisely what rights he is referring to, they would appear to be testate rights, *i. e.*, claims which Mrs. Lee and her descendants may have by virtue of wills written by other parties to the settlement agreement. (*Cf.* paragraph 5 above.) And third, Hugh Hunt maintains that the January 16 agreement did not call for a relinquishment by him of his children's rights. (*Cf.* paragraphs 1, 2 and 5 above.)

The transcript shows that the agreement was not clear in all respects on January 16, and there is ample room for argument about the intended scope of the releases.[7]

7. The attorney for the Hunt Estate stated the agreement as follows:

MR. COOK (counsel for the Estate): Item two. That Mrs. Lee and all of her descendants would sign a release releasing all parties from any claim, including future inheritance rights in the Estate of any members of the Hunt family, which release will contain appropriate indemnity provisions.

MR. FRITCHIE (counsel for Mrs. Lee): You are now talking—excuse me—I have to ask you at this point when you say "All rights of future inheritance" he means by operation of law?

THE COURT: By operation of law.

MR. COOK: That is right.

MR. FRITCHIE: When you say, "Mrs. Lee and all of her descendants," you are talking about Mrs. Lee and those of her descendants who are of the age of majority?

With respect to the agreement's release of claims unrelated to the relationship between Mrs. Lee and H. L. Hunt, there is language in the transcript describing the agreement as "a final settlement" and a release "from any claim." But the court also describes the agreement as only a settlement "as to this lawsuit and as to any possible inheritance rights." There is an even more direct conflict on the issue of inheritance rights. When asked about them at the outset, counsel for the Hunt Estate agreed with counsel for Mrs. Lee that "all rights of future inheritance" meant only such rights as exist "by operation of law," which would appear to exclude testate rights. But at a later point in the transcript the court refers to "any possible inheritance rights should they occur," and appears to disagree with Hugh Hunt's understanding that the parties had intended to limit the releases to rights related to the subject matter of the lawsuit. As to releases which affect the rights of the signatories' descendants, Hugh Hunt expressed some

> MR. COOK: And their respective spouses, and I think at this time it might be well to list all of the parties to be included.
>
> Record at 1263. Later in the meeting Hugh Hunt was asked whether his children would sign the agreement. The following colloquy then took place:
>
> MR. HUGH LEE HUNT: You see, we never talked about inheritance rights, God forbid that something should happen that the entire first family should be wiped out, let's say something like that did happen.
>
> MR. HIRSCHKOP (counsel for Herbert and Lamar Hunt): Give you all inheritance rights?
>
> · MR. HUGH LEE HUNT: We would have inheritance rights I understand by Texas law.
>
> MR. COOK: This is what is being settled at this time, this is being released.
>
> MR. HUGH LEE HUNT: We never agreed to this, there was no discussion on this.
>
> MR. HUNTER: Yes, there was.
>
> MR. HUGH LEE HUNT: There was discussion on the fact that we would not do anything on public statements and everything else like that.
>
> MR. FRITCHIE: That you would give up inheritance rights.
>
> MR. HUGH LEE HUNT: Anything having to do with this suit, with the issue of this suit we would not be involved in, but if you remember there was some discussion about—
>
> MR. HUNTER: (Interposing) What inheritance rights is anybody conceivably talking about other than possibly collateral heirs in-

doubt as to his ability to "legally sign away any of my children's rights." These doubts were never specifically addressed by counsel for the Hunt Estate, and the master settlement agreement does in effect waive rights of the signer's descendants.[8]

Under Texas law, the interpretation of an unambiguous contract—as well as the determination of whether or not a contract is ambiguous—is a legal question. But once it is determined that a contract is ambiguous, the determination of the actual intent of the parties becomes a factual question. *Trinity Universal Insurance Co. v. Ponsford Brothers*, 423 S.W.2d 571 (Tex. 1968). *See Pletz v. Christian Herald Association*, 486 F.2d 94 (5th Cir. 1973); *Hennigan v. Chargers Football Co.*, 431 F.2d 308 (5th Cir. 1970); *Roy L. Jones, Inc. v. Home Transportation Co.*, 422 F.2d 179 (5th Cir. 1970). Hugh Hunt's interpretation of the intent of the January 16 agreement is arguable on the basis of vague and conflicting

> heriting from someone else if they did not leave a will or something?
>
> · THE COURT: That's the question and that is the only thing that is being discussed and it was discussed here in chambers that the settlement was as to this lawsuit and as to any possible inheritance rights should they occur, and I understand that to be the basis of the settlement also.
>
> MR. HUNTER: I understand that, too, Judge, there is no question.
>
> THE COURT: In other words, all of the parties who have discussed this matter up to this point have understood that this was a final settlement.
>
> Record at 1265–1267. It was at this point that Hugh Hunt became upset and left the judge's chambers. No further discussion involved the releases to be included in the final document, aside from an agreement among the parties that all lawsuits would be dismissed except for Hugh Hunt's existing suit in Georgia.

**8.** The master settlement agreement purports to bind the heirs, successors, assigns and legal representatives of all of the signatories. Under Texas law, the waiver of future interests and expectancies may contractually bind the descendants and other successors of the actual signatory to the agreement. *E. g., Trevino v. Turcotte*, 564 S.W.2d 682 (Tex.1978); *McConnell v. Corgey*, 262 S.W.2d 944 (Tex.1953).

statements in the transcript. But we find that the transcript agreement is ambiguous with respect to these issues, and therefore we must defer to the trial court's resolution of the factual issue of intent unless his findings are "clearly erroneous." Fed.R. Civ.P. 52(a). The trial court considered Hugh Hunt's arguments on the scope of the releases contemplated by the January 16 agreement and concluded that the intent of the January 16 agreement is fairly embodied in the master settlement agreement.[9] 483 F.Supp. at 834–35. In this case the trial court's findings are due particular deference, for the court presided over the trial and was present at the formation and execution of the agreement it was called upon to interpret. On the basis of the transcript of the January 16 meeting, we cannot say that the district court's findings were clearly erroneous.

In addition to the scope of the releases, Hugh Hunt points to several other discrepancies between the January 16 agreement and the master settlement agreement. First, he notes that the requirement for the signatures of Hugh Hunt's descendants was dropped in the final document. But as we have already stated, the Hunt Estate had preserved a right to do this. Second, he argues that the actual distribution of the settlement funds is not set out in the January 16 agreement. This distribution was left open so that Mrs. Lee could thereafter decide precisely how the money should be distributed for the most favorable tax treatment. 483 F.Supp. at 836. Hugh Hunt made no objection to this arrangement and we do not believe that the deferral of this matter is relevant to his obligations. Third, Hugh Hunt maintains that the provision in the master settlement agreement stipulating that Texas law shall

govern the interpretation of the agreement was not discussed or contemplated on January 16. It is true that the transcript of the January 16 meeting includes no reference to the parties' contractual choice of law; but since Texas law would govern in the absence of an agreement, the provision has no effect on any of the parties. Finally, Hugh Hunt argues that the master settlement agreement does not honor the Hunt Estate's purported agreement to obtain new trustees for certain trusts previously established for the benefit of Mrs. Lee's children and grandchildren. But the representation of counsel for the Hunt Estate in the January 16 meeting was only that:

It is understood that Mrs. Lee and her children may want to arrange for the appointment of a different advisory committee or a different trustee. Ray Lee Hunt is agreeable to this being done provided it can be legally done. He will cooperate in every way to provide for a change in either the advisory committee or the trustee.

Record at 1282. As the district court noted, such a change was not possible under applicable state law. 483 F.Supp. at 836. We conclude that the district court correctly found that the master settlement agreement is a reasonable embodiment of the intentions of the parties in the January 16 agreement, and that Hugh Hunt may properly be required to execute it.

## VI. THE PURPORTED ILLEGALITY OF THE CONTRACT

■■ Finally, Hugh Hunt argues that certain provisions of the master settlement agreement are *contra bones mores* under Louisiana law. In particular, he points to Louisiana cases which prohibit the renunciation of inheritance rights which depend on

9. These arguments are not all discussed in the opinion of the district court. That opinion does not explicitly deal with Hugh Hunt's contentions that (1) the January 16 agreement did not even call for a release of *present* claims that were unrelated to the relationship between Mrs. Lee and H. L. Hunt, and (2) the January 16 agreement did not contemplate his release of his children's rights. We note that Hugh Hunt's argument to the district court did not

clearly delineate the different aspects of his disagreement with the release provisions of the master settlement agreement. Memorandum of Hugh L. Hunt in Opposition to Defendant's Motion to Enforce the Settlement Agreement, Record at 2825. In the context of the arguments made to the district court, and of that court's order and opinion, it is clear that the district court nevertheless rejected these contentions as a matter of fact.

the death of some living person, and to a Louisiana constitutional provision which prohibits discrimination on the basis of illegitimacy in matters of property or inheritance. We doubt that these policies, even if applicable, would void the entire contract. So long as the consideration is legal and the provisions are separable, those contractual provisions which are not illegal may still be enforced. *Williams v. Williams*, 569 S.W.2d 867 (Tex.1978). But it is not necessary to reach this question or to determine the precise relevance of the asserted Louisiana policies to the master settlement agreement. As we determined *supra*, it is the law of Texas that governs this contract. And, although the district court made the same determination, Hugh Hunt has at no point contended that any provision of the agreement is contrary to Texas law.

We conclude that the January 16 settlement agreement embodied in the transcript of the conference held that day in the judge's chambers is an enforceable contract of settlement under Texas law and is binding on Hugh Hunt. We also conclude that the master settlement agreement reasonably represents the intent of the January 16 agreement, and that Hugh Hunt may be bound by its terms. The judgment of the district court is affirmed in all respects.

AFFIRMED.