**STEUBER COMPANY, INC.,**
**Plaintiff-Appellant,**

v.

**HERCULES, INCORPORATED and Robertson Terminals, Inc.,**
**Defendants-Appellees.**

**No. 80–1032.**

United States Court of Appeals,
Fifth Circuit.
Unit A

June 5, 1981.

Rehearings Denied July 27, 1981.

---

B. Thomas Cook and Kenneth R. Wynne, Houston, Tex., for plaintiff-appellant.

Reynolds, Allen & Cook, K. Charles Peterson and Lloyd R. Cunningham, Jr., Houston, Tex., Fulbright & Jaworski, Dana G. Kirk, Houston, Tex., for defendants-appellees.

Alice Oliver Trevathan, Houston, Tex., for Robertson Terminals, Inc.

Before AINSWORTH and Sam D. JOHN-SON, Circuit Judges, and HUNTER *, District Judge.

EDWIN F. HUNTER, District Judge:

This Texas diversity action arises out of a contract between Steuber Company, Inc. and Hercules, Inc. for the sale of some 900,000 gallons of methanol (methy alcohol) which at the time of the contract was aboard a vessel en route to the United States from Japan.

Hercules, the buyer, refused to accept the methanol when the vessel arrived at its destination, the DuPont plant in Beaumont, Texas (Hercules having previously arranged for the methanol to be unloaded there). Prior to this rejection by Hercules, DuPont had refused to take the methanol into its tanks on the ground that it failed to meet DuPont's specifications. After it was rejected by Hercules, Steuber arranged to store the methanol in the tanks of Robertson Terminals, Inc. at Robertson's storage facility in Deer Park, Texas, and it was stored there until it was sold to another purchaser. Thereafter, Steuber brought suit against Hercules, alleging that Hercules had breached the sales contract, and against Robertson, alleging that the methanol had become contaminated during its storage.

The case was tried before a jury. After four and one-half days of trial and at the close of all the evidence, each party moved for a directed verdict. Denying Steuber's motion, the trial court granted the motions for directed verdicts by Hercules and Robertson. Steuber has appealed, contending that the trial court erred in granting directed verdicts in favor of the defendants and in failing to grant a directed verdict in its favor. Finding merit in the first of these contentions, we reverse and remand the case to the district court.

▇▇▇ In a diversity case in this circuit, we apply a federal rather than a state standard for determining whether evidence in a trial is sufficient to create a jury question and to defeat a motion for a directed verdict. *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (*en banc*). That standard is:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

411 F.2d at 374–375. See *McCormack v. Noble Drilling Corp.*, 608 F.2d 169 (5th Cir. 1979); *Stockstill v. Gypsum Transportation*, 607 F.2d 1112 (5th Cir. 1979).

## THE CLAIM AGAINST HERCULES

In early September, 1974, approximately 2,762 metric tons of methanol were loaded on board the M/V Post Ranger in Kobe, Japan, and bills of lading were issued by the vessel calling for the transportation of the methanol to Beaumont, Texas. While

---

* District Judge of the Western District of Louisiana, sitting by designation.

the Post Ranger was at sea, Hercules contracted to buy the methanol from Steuber. When the Post Ranger arrived alongside the DuPont storage facility at Beaumont, Texas on October 23, 1974, DuPont refused to allow the methanol to be off-loaded into its tanks solely because DuPont believed that it failed to meet DuPont's specifications. Hercules refused to accept or pay for it. Steuber representatives arranged with Robertson to store the methanol at its Deer Park, Texas facility. Steuber was unable to dispose of it until Delmarva Chemicals agreed to buy in April of 1975, for a price much lower than Hercules originally agreed to pay. Plaintiff seeks to recover the difference between the price agreed upon in the Steuber/Hercules contract and the price ultimately obtained in the substitute sale, plus incidental damages.

The written contract which embodied the agreement between Steuber and Hercules consisted of three documents:

 (i) Px. 8—a telex from Steuber to Hercules describing a sale by Steuber to Hercules on C.I.F. terms of approximately 2800 metric tons of methanol at $187 per metric ton (equal to 61¢ per gallon) and indicating that confirming paperwork would be sent later;

 (ii) Px. 9—a purchase order prepared and sent by Hercules to Steuber confirming Hercules' commitment to buy the methanol on C.I.F. terms; and

(iii) Px. 11A and Px. 11B—two sales confirmation forms from Steuber to Hercules confirming Steuber's earlier telex.

Although these documents indicate that the delivery term of the contract was "CIF DuPont Terminal, Beaumont, Texas,"[1] conflicting evidence was presented at trial concerning the agreement of the parties as to delivery. The evidence reveals that Irwin Neulight of Steuber and Harry Winn of

Hercules first reached an oral agreement for the sale in a telephonic conversation on October 3, 1974, and then documented the deal by the documents described in the preceding paragraph.

Winn testified that he told Neulight that Hercules was particularly interested in purchasing methanol in the DuPont tank because Hercules had no means of accepting delivery at its plant. Winn testified that he agreed to the delivery term suggested by Neulight ("CIF DuPont Terminal, Beaumont, Texas") based upon his understanding that the methanol was "to be in the tank," and stated that he assumed the methanol would meet DuPont's specifications since it was to be placed in DuPont's tanks.

Neulight recalled their negotiations differently. He testified that Winn liked the idea that the vessel was bound for the DuPont facility, but Neulight stated that he "absolutely never" indicated to Winn that Steuber would be responsible for actually putting the methanol into the DuPont tanks. Neulight testified that under a C.I.F. contract, the buyer typically makes storage and receiving arrangements and that a product would be sold on a "delivered" basis if the seller agreed to put it into the shore tanks at the end of the voyage; he stated that the use of the words "C.I.F." and "delivered" in the same contract would be inconsistent.

█ The Uniform Commercial Code[2] has codified the well-settled principles of commercial law relating to C.I.F. contracts. A contract containing the phrase C.I.F. plus a destination requires the seller to deliver goods meeting the contract description on an appropriate carrier, obtain prepaid bills of lading and appropriate insurance certificates for the goods, and then tender these documents plus an invoice to the buyer. Upon tender of these documents, the buyer must pay the full C.I.F. price to the seller.

---

1.  This was the wording used in Steuber's sales confirmation. The purchase order prepared by Hercules stated the delivery term as "CIF du-Pont Tank, Beaumont, Texas, Duty Unpaid." The term "CIF" means that the price includes in a lump sum the costs of the goods and the insurance and freight to the named destination.

2.  Tex.Bus. & Comm.Code Ann. §§ 1.101–11.108 as adopted in Texas.

Delivery and possession of conforming goods then becomes a matter between the buyer and the carrier and/or insurer of the goods, but the seller's involvement in the transaction is at an end. In other words, under C.I.F. terms, the buyer pays on delivery of *documents*; the risk of loss during shipment and the responsibility for delivery and unloading of the *goods* are for the buyer.[3] However, terms or conditions agreed to by the parties must control over the general reference to C.I.F. contained on the face of the document. This fact is recognized, not only in the commentary but also the express language, "unless otherwise agreed," of the sections of the Uniform Commercial Code. See Tex.Bus. and Commercial Code Ann. § 2.320, 2.504. Hercules argues that the oral conversations between Winn and Neulight on October 2 and 3 of 1974 constitute proof positive that Steuber agreed to physically place the methanol into the DuPont storage tank. If this alleged oral agreement was part of the Steuber/Hercules contract, then and in that case Hercules should prevail—but Hercules has ignored Mr. Neulight's testimony that the conversations described by Mr. Winn "absolutely never" occurred. The right to determine the credibility of witnesses lies at the very core of the jury's fact finding function.

Guided by the standards enunciated in *Boeing v. Shipman, supra*, we conclude that Steuber presented substantial evidence, far more than sufficient to withstand a motion for a directed verdict.

This is a case where there exists a conflict in substantial evidence. Reasonable and fair-minded persons in the exercise of impartial judgment might well reach different conclusions concerning the terms of the contract. We reverse the judgment of the district court in granting the Hercules motion for a directed verdict.

## THE CLAIM AGAINST ROBERTSON

Steuber's claim against Robertson is for the difference between the methanol's market values before and after Robertson's alleged contamination of it. The propriety of the trial court's granting Robertson's motion for a directed verdict is, of course, to be assessed by the standard enunciated in *Boeing v. Shipman, supra.*

Unable to deposit the methanol in DuPont's tanks, Irwin Neulight, the Steuber employee in charge of this transaction, set about the task of finding temporary shore tank storage space for the methanol. Shore tank storage space was very tight on the Gulf Coast. Neulight contacted Mr. Ben Ditta of Robertson in the late afternoon of Friday, October 25, 1974. Ditta informed him that the only two tanks available had not been cleaned and that one had last contained isopropyl alcohol, and the other still contained 500 barrels of acrylonitrile, which Ditta agreed to remove promptly. Neulight decided to accept the storage facilities. This oral agreement was later confirmed by Neulight's telex and Ditta's letter. Before the methanol was unloaded at Robertson Terminals on October 26 and 27, Steuber paid Chas Martin Inspectors to inspect the tanks, and the inspector found the tanks "suitably clean for receiving methanol."

Two documents comprise the written agreement: (i) the telex from Neulight to Ditta, and (ii) a confirming letter from Ditta to Neulight dated October 29, 1974. These two exhibits suggest that the only limitation on Robertson's liability as bailee was as to the methanol's possible "odor contamination." The relevant portion of the telex contains the following language:

"Tank No 330 presently contains approx 500 barrels acrylonitrile which will be removed and vapor to be incinerated. It is understood that the approx 12 hours available prior to vessel arrival is insufficient for complete disposal of vapor and, therefore, it is likely that the methanol will pick up some odor contamination. We agreed to exonerate Robertson Terminals from any liabilities in this particular regard.

---

**3.** Tex.Bus. & Comm.Code Ann. § 2.320.

Ditta's confirming letter, although not as detailed as Neulight's telex, corroborates that Robertson is excused for "odor contamination."

Steuber asserts that a portion of the methanol became contaminated immediately after Robertson took possession of it and placed it in Tank 330. The Charles Martin survey dated October 27, 1974 reveals that the product had permanganate times of more than 50 to 70 minutes, when tested immediately prior to discharge, but that the permanganate times dropped to zero when tested in Tank 330 immediately after discharge.[4] Based on all the tests, Dr. Mosier testified that this methanol became "excessively" and "grossly" contaminated.[5]

Steuber premises its defense as to liability upon the limitation of liability contained in the contract documents[6] and insists that the damage sustained as a result of the drop in permanganate time in Tank 330 was the direct result of the very risk of which Steuber agreed to exonerate Robertson.

Both at trial and on appeal, the parties contend that the contract language is not ambiguous. However, they read it quite differently. Robertson reasons that the language is a limitation of liability for any contamination which might occur as a result of the presence of acrylonitrile vapor. Steuber asserts that the only limitation has to do with contamination of odor and notes that it has never claimed or complained that the odor was affected.

The district court, without articulating its reasons, granted Robertson's motion for a directed verdict. It appears most likely that the decision was predicated on his feeling that Robertson's interpretation of the contract was correct to the extent that no reasonable person could have interpreted it in any other way.

■ Under Texas law, the interpretation of an unambiguous contract, as well as the determination of whether or not a contract is ambiguous, is a legal question. But once it is determined that a contract is ambiguous, the determination of the actual intent of the parties becomes a factual question. *Palmer v. Fuqua*, 641 F.2d 1146 (5th Cir. 1981); *Lee v. Hunt*, 631 F.2d 1171, 1180 (5th Cir. 1980). But, if there should be any difference between the state and federal rule, it must be emphasized that the right to a jury determination is to be determined as a matter of federal law in diversity as well as other actions. *Ammons v. Franklin Life Insurance Company*, 348 F.2d 414, 416 (5th Cir. 1965). Here, the storage contract contains latent and patent ambiguities and is certainly susceptible of more than one meaning. It is unclear whether the agreement exonerates Robertson from liability for any damage resulting from a particular source, acrylonitrile vapor, or whether Robertson's liability is limited only as to a particular kind of damage, odor contamination.

■ Our review of the evidence suggests that such a distinction is not a spurious one. The standard specification for methanol published by the American Society for Testing and Materials (ASTM), the generally accepted authority in the industry, contains a number of requirements, including separate specifications for odor and the potassium permanganate test. The ASTM standard specifies that the potassium permanganate test time must be at least 50 minutes, while the odor is required to be "characteristic, nonresidual." The various methanol analyses introduced in evidence at trial report odor and the potassi-

4. To conduct the test, potassium permanganate solution is added to methanol and the chemist measures the number of minutes which elapse before the methanol changes color. The color change is indicative of a chemical reaction, and the test is designed to determine whether contaminants are present in methanol. Potassium permanganate reacts very slowly with pure methanol but more rapidly when contaminants are present; thus, a short test time indicates that contaminants are present.

The trial testimony revealed that acrylonitrile (liquid or vapor) could and/or would affect the potassium permanganate test results by causing a reduction of the potassium permanganate test time.

5. The material in Tank 331 was substantially unchanged in chemical character.

6. The telex from Neulight and the confirming letter from Ditta.

um permanganate test separately. The analysis relied upon by Steuber at trial to prove the alleged contamination reflects that the methanol sample drawn from Tank No. 330 had a potassium permanganate test time of zero minutes, well below the ASTM specification, yet the odor of that sample is reported as acceptable.

The ambiguity of the storage contract necessitated a determination of the intent of the parties to the contract, a jury question. A fact question was also presented regarding the cause of the alleged contamination; evidence was presented which suggested that as much as 181 gallons of acrylonitrile liquid (not vapor) may have been left in Tank No. 330. There was also some evidence of dirty hoses and lines supplied by Robertson to transport the product from the vessel to Tank 330. Only if Robertson had conclusively established that acrylonitrile vapor was, in fact, the only cause of the contamination, would Robertson bring itself within its own interpretation of its contracted limitation of liability contention.

## CONCLUSION

After a careful reading of the record, we hold that a consideration of the evidence presented at trial compels a conclusion that conflicting issues of fact were presented, upon which reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. Accordingly, we vacate the judgment of the District Court and remand to that court for further proceedings consistent with this opinion.

VACATED AND REMANDED.