**KENAN DENIZCILIK TICARET VE SANAYI A.S. ISTANBUL, as owners of the M/V NAZLI POYRAZ**

**v.**

**1207 COILS MORE OR LESS OF HOT ROLLED STEEL**

**TUBERIA NACIONAL, S.A. de C.V.**

**v.**

**The CARGO VESSEL NAZLI POYRAZ, her engines, tackle, apparel, etc., IN REM**

Civil Action Nos. B–94–216, B–94–217.

United States District Court,
S.D. Texas,
Brownsville Division.

Nov. 18, 1996.

Dennis Sanchez, Sanchez, Whittington & Janis, Brownsville, TX, for Tuberia Nacional, S.A. de C.V.

James E. Ross, Edwin K. Nelson, IV, James E. Ross & Associates, Houston, TX, for Cargo Vessel NAZLI POYRAZ.

### MEMORANDUM AND FINAL JUDGMENT

BLACK, United States Magistrate Judge.

This case is before this Court pursuant to 28 U.S.C. § 636(c). On July 8 and 9, 1996, the parties appeared in person and through counsel for trial. Based on the pleadings, the arguments, evidence presented at trial, and supplemental arguments contained in trial briefs submitted by counsel, the Court makes this Memorandum and Final Judgment.

### I. BACKGROUND FACTS

On March 25, 1994, Tuberia Nacional, S.A. de C.V. ("Tuberia"), a Mexican Corporation placed an order for 10,000 metric tons of hot rolled steel plate with Ferrostaal Metals Corporation ("Ferrostaal"). (Pl.'s Ex. 10). The "orden de compra" (purchase order) specified the following:

"CAND [sic] F

LANDED

BROWNSVILLE, TX

TX SIGHT."

*Id.* The total purchase price was slightly in excess of $3,000,000.00. The steel was loaded aboard the *in rem* defendant M/V NAZLI POYRAZ in St. Petersburg, Russia, and a clean bill of lading was issued on June 8, 1994. (Pl.'s Ex. 13).

Tuberia paid for the steel by an irrevocable letter of credit in the amount of $2,930,-000.00 dated April 6, 1994, issued by Banco Nacional de Mexico's Houston, Texas, branch. (Pl.'s Ex. 12 and 15a). The letter of credit was to be honored by Ferrostaal presenting sight drafts accompanied by various documents including a clean on board ocean bill of lading evidencing shipment of the steel which Tuberia had purchased from Ferrostaal. The letter of credit contained the following language: "**SHIPMENT TERMS: C AND F LANDED, BROWNSVILLE, TEXAS.**" *Id.* (emphasis in original). In addition, the letter of credit had a plus-or-minus-ten-percent factor built-in. Ferrostaal presented the appropriate documents on July 5, 1994, and was paid $3,033,701.49.

The M/V NAZLI POYRAZ left St. Petersburg bound for Brownsville with an interim stop in Houston. Between Houston and Brownsville, fuel oil leaked through holes in overflow and ventilation pipes staining some of the steel coils.

When the vessel arrived in Brownsville, this problem was discovered. The coils were unloaded and partially cleaned at the Port of Brownsville. They were then taken to Monterrey, Mexico where they were cleaned at Tuberia's plant. Tuberia seeks damages for the expenses incurred in the cleaning.

### II. THE LAWSUIT

The owner of the M/V NAZLI POYRAZ, a Turkish Corporation named Kenan Denizcilik Ticaret Ve Sanayi, A.S. Istanbul ("Kenan") filed an *in rem* action against the cargo claiming that it was entitled to expenses it had incurred in unloading the cargo in Brownsville. This suit was docketed as B–94–216.

A few days later, Tuberia filed an *in rem* action against the M/V NAZLI POYRAZ claiming that the unseaworthiness of the vessel and the negligence of its owners had caused the damage to the steel. Recovery was sought under the Carriage of Goods at Sea Act, 46 U.S.C.App. § 1300 *et seq.* ("COGSA"), the Harter Act, 46 U.S.C.App. § 190 *et*

seq., and the Pomerene Bills of Lading Act, 49 U.S.C.App. § 81 et seq. (repealed 1994). This case was docketed as B–94–217. These cases were consolidated under cause number B–94–216.

## III. THE POSITIONS OF THE PARTIES

Tuberia argues that it is entitled to recover its costs incurred in cleaning the steel coils.[1] Tuberia claims that the M/V NAZLI POYRAZ is liable because the damage was caused by the unseaworthiness of the vessel. Specifically, Tuberia blames the damage on fuel oil leaking out of a sounding pipe and a ventilation pipe which had holes in them. This leakage apparently occurred while the vessel was at sea between Houston and Brownsville and the crew neglected to close a valve during a fuel transfer operation. According to Tuberia, the fuel leaked onto the steel coils, because the two pipes had numerous holes rusted through them. This condition rendered the M/V NAZLI POYRAZ unseaworthy, imposing liability under COGSA.

The M/V NAZLI POYRAZ raises the following defenses:

1. Tuberia does not have standing to bring this case, since it was not a party to the contract of carriage.

2. Tuberia did not own the cargo at the time it was damaged.

3. Tuberia was not an intended beneficiary of the contract of carriage.

4. Tuberia was not a bona fide purchaser in good faith of the cargo.

5. Tuberia did not rely on bills of lading in purchasing the cargo.

6. Those in charge of the M/V NAZLI POYRAZ exercised due diligence to make it seaworthy at the commencement of the voyage.

7. The damage to the cargo was caused by an error in navigation and management of the vessel.

8. There was no damage.

9. Tuberia failed to mitigate and in fact exacerbated its damage.

10. Tuberia waived any claims by reason of its failure to make a claim on the supplier of the cargo.

## IV. DISCUSSION

The parties have agreed that the resolution of Tuberia's claims is governed by COGSA, 46 U.S.C. § 1300 et seq., the general maritime law and the Texas codification of the Uniform Commercial Code, TEX.BUS. & COM.CODE ANN. §§ 1.01–6.111 (Vernon 1994 & Supp.1996), and §§ 7.101–11.108 (Vernon 1991 & Supp.1996).

The real issues in this case are:

A. Did title to the steel pass to Tuberia when it was loaded on the M/V NAZLI POYRAZ in St. Petersburg?

B. Was the damage to the cargo caused by the unseaworthiness of the M/V NAZLI POYRAZ or an error in the vessel's management and navigation?

C. What are Tuberia's damages?

### A.

### DID TITLE PASS TO TUBERIA IN ST. PETERSBURG?

The letter of credit, (Pl.'s Ex. 12 and 15a), stated under "shipment terms," "C AND F LANDED BROWNSVILLE, TX." The bill of lading issued in St. Petersburg, Russia stated, "Freight Prepaid." (Pl.'s Ex. 13).

The vessel argues that title to the steel did not pass until it was unloaded in Brownsville therefore Tuberia has no standing to claim damages. The vessel's argument is grounded on its reading of TEX.BUS. & COM.CODE ANN. § 2.322 which states in pertinent part, "Unless otherwise agreed a term for delivery of goods 'ex-ship' ... or in equivalent language ... [means] the risk of loss does not pass to the buyer until the goods leave the ship's tackle or are otherwise properly unloaded." The vessel asserts that the term, "LANDED," is the equivalent to "ex-ship." However, in making this argument, M/V

---

1. The evidence shows that these costs were:
   (1) Materials—$3045.00;
   (2) Labor—$1280.00;
   (3) Operating machinery—$48,639.70; and
   (4) Pre- and post-judgment interest.

NAZLI POYRAZ overlooks the rest of the agreement between Ferrostaal and Tuberia and what the evidence shows actually transpired.

This issue is governed by Tex.Bus. & Com. Code Ann. § 2.320.[2] As the Fifth Circuit noted:

> A contract containing the phrase C.I.F. plus a destination requires the seller to deliver goods meeting the contract description on an appropriate carrier, obtain prepaid bills of lading and appropriate insurance certificates for the goods, and then tender these documents plus an invoice to the buyer. Upon tender of these documents, the buyer must pay the full C.I.F. price to the seller. Delivery and possession of conforming goods then becomes a matter between the buyer and the carrier and/or insurer of the goods, but the seller's involvement in the transaction is at an end. In other words, under C.I.F. terms, the buyer pays on delivery of documents; the risk of loss during shipment and the responsibility for delivery and unloading of the goods are for the buyer.

*Steuber Co. v. Hercules, Inc.*, 646 F.2d 1093, 1096–1097 (5th Cir. Unit A July 1981) (citation omitted). Significantly, the official commentary provides as follows:

> The C.I.F. contract is not a destination but a shipment contract with risk of subsequent loss or damage to the goods passing to the buyer upon shipment if the seller has properly performed all his obligations with respect to the goods. **Delivery to the carrier is delivery to the buyer for purposes of risk and "title"** . . . . .

*Id.* cmt. 1 (emphasis added). "Under the C. & F. term, as under the C.I.F. term, title and risk of loss are intended to pass to the buyer on shipment." *Id.* cmt. 16.

The C & F language contained in the letter of credit clearly means that title passed when the cargo was loaded in St.

Petersburg. In addition to the plain meaning of the agreed upon terms, there is ample evidence that such was the understanding of both Tuberia and Ferrostaal: Ferrostaal drew on the letter of credit *before* the vessel arrived in Brownsville. Title passed to Tuberia in St. Petersburg. *C.f. Steuber Co.*, 646 F.2d at 1096–1097.

### B.

### WAS THE DAMAGE TO THE CARGO CAUSED BY UNSEAWORTHINESS OR AN ERROR IN THE NAVIGATION OR MANAGEMENT OF M/V NAZLI POYRAZ?

While M/V NAZLI POYRAZ was between Houston and Brownsville, fuel was transferred from one tank to another. The crew of the vessel failed to close a valve while the transfer was underway. Fuel rose in a sounding pipe and a ventilation pipe in holds two and three of the vessel. Both of these pipes had rust holes in them. The fuel spilled through these holes, staining some of the steel. Photographic exhibits, see, e.g., Pl.'s Ex. 41, demonstrate clearly that the damage to the two pipes was long standing. At some time in the past, efforts had been made to patch the leaking pipes with concrete.

COGSA section 1303 imposes on the carrier the duty to exercise due diligence to provide a seaworthy ship and to "make the holds . . . and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation." 28 U.S.C.App. § 1303(1)(a)(c). The owner of M/V NAZLI POYRAZ breached its duty to furnish a vessel reasonably fit for its intended purpose at the commencement of the voyage. *See Jamaica Nutrition Holdings, Ltd. v. United Shipping Co.*, 643 F.2d 376, 379 (5th Cir. Unit A Apr. 1981).

M/V NAZLI POYRAZ argues that the neglect of a crew member in failing to close a

---

2. Section 2.320 provides, in pertinent part:
   (a) The term C.I.F. means that the price includes in a lump sum the cost of the goods and the insurance and freight to the named destination. The term C. & F. or C.F. means that the price so includes cost and freight to the named destination.

   . . . .
   (c) Unless otherwise agreed the term C. & F. or its equivalent has the same effect and imposes upon the seller the same obligations and risks as a C.I.F. term except the obligation as to insurance. . . . .

   Tex.Bus. & Com.Code Ann. § 2.230(a), (c).

valve caused the oil to leak into the hold. COGSA section 1304 exonerates a carrier from responsibility for damages arising from neglect or default of a crew member in the management of the ship. 46 U.S.C.App. § 1304(2)(a).

■ COGSA establishes a matrix for determining liability in a cargo damage case. *See* 46 U.S.C.App. § 1303. In the first instance, the burden is on the cargo owner to establish that the cargo was loaded in an undamaged condition and unloaded in a damaged condition. *Tubacex, Inc. v. M/V RI-SAN,* 45 F.3d 951, 954 (5th Cir.1995).

Tuberia has satisfied that burden by producing a clean bill of lading and showing the steel cargo was stained by fuel oil which leaked into the cargo hold through holes in the sounding pipes and ventilation pipes. *See* 46 U.S.C.App. § 1304(4). The burden then shifts to the carrier to show that it exercised due diligence in making the vessel seaworthy, 46 U.S.C.App. § 1304(1), and that the damage was caused by one of the enumerated factors set forth in 46 U.S.C.App. § 1304(2). *Tubacex, Inc.,* 45 F.3d at 954.

■ M/V NAZLI POYRAZ failed to exercise due diligence in furnishing a seaworthy vessel. That is clearly shown by the fact that the holes through which the oil leaked were of long standing. Thus, this Court finds that M/V NAZLI POYRAZ was unseaworthy when it left St. Petersburg. *Aguirre v. Citizens Casualty Co.,* 441 F.2d 141, 144 (5th Cir.) (noting that seaworthiness is issue for trier of fact) (citations omitted), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971); *c.f. Jamaica Nutrition Holdings, Ltd.,* 643 F.2d at 379 (affirming trial court's finding that vessel made unseaworthy for transport of soybean oil when a molasses residue not removed before loading).

However, the vessel then argues that the negligence of the crew caused the damage, and thus the vessel is exempted from liability under Section 1304(2). *Quaker Oats Co. v. M/V TORVANGER,* 734 F.2d 238, 240–241 (5th Cir.1984) (citations omitted), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985); *Nitram, Inc. v. Cretan*

*Life,* 599 F.2d 1359, 1373 (5th Cir.1979); *Tubacex, Inc.,* 45 F.3d at 954.

The question then is whether or not the negligence of crew exoneration provision in COGSA trumps the unseaworthiness-liability provision in COGSA. The Fifth Circuit has answered this question adversely to the vessel, *Orient Mid–East Lines v. A Shipment of Rice on Board S.S. Orient Transporter,* 496 F.2d 1032, 1041 (5th Cir.1974) (finding liability where unseaworthiness a "substantial" factor in producing damages, despite ineptness of crew), *cert. denied,* 420 U.S. 1005, 95 S.Ct. 1447, 43 L.Ed.2d 763 (1975). The fact that crew negligence was a contributing cause of the damage does not relieve M/V NAZLI POYRAZ from liability in failing to exercise due diligence to furnish a seaworthy vessel. M/V NAZLI POYRAZ is liable, *in rem,* for damages caused by this unseaworthiness. *See also Cactus Pipe & Supply v. M/V MONTMARTRE,* 756 F.2d 1103 (5th Cir.1985).

### C.

### WHAT ARE TUBERIA'S DAMAGES?

Tuberia is entitled to its expenses in reconditioning the steel. *C.f. Texport Oil Co. v. M/V AMOLYNTOS,* 11 F.3d 361, 365 (2d Cir.1993) (observing that no "hard and fast rule" existed for calculating damages under COGSA). The Court finds those expenses to be $52,964.70.

The Court further finds that Tuberia is entitled to interest on this amount at the legal rate from the date of delivery, July 15, 1994. *Socony Mobil Oil Co. v. Texas Coastal & International,* 559 F.2d 1008, 1014 (5th Cir.1977); *c.f. Mitsui & Co. v. American Export Lines,* 636 F.2d 807, 824–825 (2d Cir.1981) (observing that, absent "peculiar circumstances," general admiralty rule allowing prejudgment from date of delivery followed).

Tuberia is also entitled to recover court costs.

### V. JUDGMENT

IT IS ORDERED that Tuberia Nacional, S.A. de C.V. recover from M/V NAZLI POY-

RAZ the sum of $52,964.70, plus interest at the rate allowed by law from July 15, 1994, until paid, and costs of court.